**FORT WAYNE CORRUGATED PAPER CO.
v. NATIONAL LABOR RELATIONS
BOARD.**

No. 7072.

Circuit Court of Appeals, Seventh Circuit.
March 28, 1940.

Rehearing Denied May 20, 1940.

Mentor Kraus and James M. Barrett, Jr., both of Fort Wayne, Ind. (Barrett, Barrett & McNagny, of Fort Wayne, Ind., of counsel), for petitioner.

Charles Fahy, Gen. Counsel, Robert B. Watts, Associate Gen. Counsel, Laurence A. Knapp, Asst. Gen. Counsel, Alvin J. Rockwell, Mortimer B. Wolf, and Allen Heald, all of Washington, D. C., for National Labor Relations Board.

Before EVANS, TREANOR, and KERNER, Circuit Judges.

EVANS, Circuit Judge.

This case is before us on a petition by the Fort Wayne Corrugated Paper Company, an Indiana corporation, to review an order of the National Labor Relations Board, and the answer of the National Labor Relations Board which seeks an enforcement of its order. The order under review directs a cessation of enumerated unfair practices, including inter alia, espionage through hired detectives. The order calls for collective bargaining with Local 182 and, upon request of the union, the signing by the company of a written agreement embodying the terms agreed upon. It directs the reinstatement of employee Cyril Wentz, president of the union, to a position from which he had been transferred; and it directs the posting of notices stating that the company will cease and desist from the matters enumerated in the order and will take the affirmative action therein ordered.

The matters in controversy are:

(1) Was the Company under a duty to execute in writing any agreement which it reached with the union? The Company had several times refused to execute a written agreement. It had posted "memoranda" of working conditions, but refused to subscribe to the written contracts presented by the union. The Board found the Company was under a duty to reduce its agreement with the union to writing.

(2) Was the Board correct in ordering the reinstatement with pay of Cyril Wentz, as "operator of a double-backer" machine? Wentz, president of the union, had worked as such an operator, but on a change due to decrease in number of shifts, was returned to his former position of "catcher" with less pay. He was replaced by a co-employee who was senior to him in rank. The Board concluded the Company was motivated in this shift by reason of its antagonism to Wentz' union activities and not by a desire to correctly apportion positions according to seniority. A summarization of the Board's conclusion is in the margin.[1]

[1] "Cyril K. Wentz, president of the Union, was employed * * * in October 1933 as a 'catcher,' and in March 1936 was assigned to a 'double backer' machine which he operated until about the last week of August, 1937. During a bargaining conference in September, 1936, * * * Wentz asked Koester, vice president * * *, whether his position as * * * 'double backer' * * * was permanent or whether he would be 'yanked out of it.' Wentz testified without contradiction that Koester * * * replied, 'Well, kid, that is your job.'

"Throughout July 1937, * * * on at least three separate occasions, Getty the manager of operations, questioned Wentz concerning the charges which the Union had filed against the respondent. Wentz, however, did not reply, * * *. On August 4, 1937, without previous notice, Getty informed Wentz that his position as * * * 'double backer' * * * had been temporary and that the job would have to be allotted in accordance with the seniority rules * * *. Getty further informed Wentz that he did not know which of four or five employees would be entitled to the job, and that it might even be Wentz himself. Three weeks later' the operation of the 'double backer' machine was given to Ralph

(3) Was the Company engaging in an unfair labor practice when it informed its employee, Markins, that he must desist from outside labor union activities or he would be laid off? Markins, as a district official of the union, had represented employees of another company (in labor difficulties), which company was a customer of Corrugated Company. The customer company had complained to Corrugated of the latter's employee's activities. Markins did not lose his position. The Board's conclusions in reference to this issue are also set forth in the margin.[2]

Other issues raised include the correctness of the Board's finding that Corrugated refused to bargain collectively; the admission of evidence of matters occurring prior to the enactment of the Act, 29 U.S.C.A. § 151 et seq.; the order requiring posting of notices by the Company, including the statement that it would cease and desist from the condemned practices; and the correctness of the Board's action in refusing to direct the union to make its charge more definite.

Also involved is the controversy over the provision of the order directing the cessation of the company's employing hired detectives to ascertain the union activities of its employees.

*Necessity of Written Contract.* Corrugated's attack on the Board's order directing it to reduce its agreements to writ-

---

Robinson on the ground that he had more seniority. Wentz, thereupon returned to 'catching,' which was more difficult work and paid less wages. Wentz admitted that Robinson had more seniority than he and that Robinson was a member of the Union although, not active in its affairs. * * * It is the respondent's contention that the transfer of Wentz was impelled by a desire to adhere to its seniority rule under which Robinson was entitled to the job. It appears that Wentz's original transfer to the 'double backer' machine was made without regard to his seniority status, and the fact that he was permitted to keep the position for almost a year and a half indicates that the respondent did not adhere strictly to its seniority rules. Furthermore, there is no evidence that * * * Robinson * * * protested or regarded himself as aggrieved by Wentz' assignment to the 'double backer' machine. The respondent, * * * on its own initiative, * * * sought to determine whether Wentz was really entitled to the operation of the machine, and on the basis of this investigation assigned the 'double backer' machine to Robinson. * * * the investigation appears to have been confined only to Wentz. While * * * Robinson was a member of the Union he was not active; nor did he hold any such position of leadership as Wentz.

"In the light of all the facts we are convinced that the respondent's antagonism to the Union and Wentz's leadership therein motivated it in transferring Wentz * * *. We find that the respondent's transfer of Wentz * * * constituted an interference, restraint, and coercion of its employees in the exercise of the rights guaranteed in Section 7 of the Act [29 U.S.C.A. § 157]."

[2] "Markins was an active union employee who also served as chairman of the district union council. In the latter capacity Markins represented * * the employees of the Sneath Glass Company, one of the respondent's customers, in their collective bargaining efforts. On about March 29, 1937, Markins was called to Treen's office (general manager) and told by him that the Sneath Glass Company had withdrawn its business because of Markins union activities on behalf of the employees of the Sneath Glass Company. Treen thereupon warned Markins that he would have to cease such union activity or else leave the respondent's employ.

"We have found that the respondent threatened to discharge Markins on March 29, 1937, if he would not cease his activities on behalf of the employees. of the Sneath Glass Company. It is plain that the Act does not limit its protection to an employee engaged in union activities with respect to his individual employer but gives him the right 'to join or assist labor organization * * * and to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection.' Markins' activities in behalf of the employees of the Sneath Glass Company were therefore within the protection of the Act. Labor organizations * * * function * * * through a joint union council composed of representatives of various local unions. * * * Under these circumstances, to hold that an employer can discipline an employee for activities conducted in behalf of the employees of another employer would present a simple way to defeat the purposes of the Act.

"We therefore find that the respondent's treatment of Markins on March 29, 1937, constituted an interference, restraint, and coercion of its employees in the exercise of the rights guaranteed in Section 7 of the Act."

ing is several sided. It first points out that at no time after September 16, 1937, the date upon and after which it was found to have refused to collectively bargain, had it and the union arrived at an *oral agreement* which might have been reduced to writing. It argues that the union stopped negotiations then and took its grievances to the Board. Corrugated insists that its refusal to reduce to writing and sign its labor agreements prior to the present negotiations has no bearing on the present controversy. Factually, Corrugated points out that theretofore the Company and the union had always reached agreements, the main points of which were set forth in memoranda posted for the employees' perusal, which memoranda were always adhered to and were binding. It also denies any legal duty to enter into a written contract, for the following reasons: The Act does not specifically require it to do so; the act could not require it to do so, because such a construction of the statutory requirement to "collectively bargain" would constitute an unconstitutional delegation of legislative authority to the Board. Corrugated also relies on the statement of the Court in the case of National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 628, 81 L.Ed. 893, 108 A.L.R. 1352, to-wit: "The act does not compel agreements between employers and employees. *It does not compel any agreement whatever.*"

The Board, on the other hand, argues that a primary purpose of the Act is to attain a *binding* contract between employer and employee (union), and such a binding contract can only be effected by a written contract, wherein all the terms of the agreement may be set forth clearly and specifically. It also points out that the "memoranda" on which the Company relies, neglected to state that they were the culmination of negotiations with the union. Its purpose was to withhold union recognition. No other reason for choosing a single party memorandum for an agreement can be found, save its objection to negotiating with a union.

■ We have again considered the arguments advanced in favor of requiring a written contract between employer and employee or union, as well as arguments made in opposition thereto, and conclude that the Act does not obligate the employer to enter into a written contract.

This legal question was fully discussed by this court in Inland Steel Company v. Labor Board, 7 Cir., 109 F.2d 9, decided January 9, 1940. We were favored with oral argument supplemented by briefs which fully and ably discussed this phase of the Act. Conditions and results would be unworkable if this court, or any court, composed of five judges, three of whom sit in each case, so divided on this, or any other question, that, when one combination is sitting, one construction of the Act is given, only to be followed by a contrary holding when another group is sitting. The decision which we announced in the Inland Steel case was deliberately reached. It is the law in this circuit until (and *if)* a contrary ruling is made by the Supreme Court.

■ ■ While under no statutory obligation to reduce its agreement to writing, the significance of employer's action in this respect may have a bearing on another issue. There are well-nigh inescapable inferences to be drawn from the employer's posting of printed statements of its wages and labor terms and refusing to sign an agreement embodying these terms. These inferences bear on the charge of unfair labor practices. It is difficult, if not impossible, to avoid the conclusion that the employer did not wish to deal with, and would not recognize the labor union directly or impliedly, and this attitude accounts for its refusal to sign any labor agreement with a labor union, although willing to post a written or printed memorandum of its labor and wage terms and schedules. This is indicative, not only of a hostile mental attitude, but is also repugnant to the spirit of the Act, the heart of which is embodied in the right of the employees to negotiate with their employer, collectively. This right of the employee creates an obligation on employer's part not only to recognize collective bargaining as such, but also collective bargaining where employees are represented by a union. This obligation is not fully met where the employer refuses to act if its action recognizes a union. At least this is an inference which may be considered along with all the other evidence on the controverted fact issue of unfair labor practices.

*Fairness of Trial in re Employee Wentz and Soundness of Finding.* Corrugated challenges the Board's order directing reinstatement of Wentz to the position of

operator of the "double-backer" machine, from which he had been demoted, and reimbursement for pay loss during the period he held the lesser position.

The original charge filed with the Board, which Corrugated tried unsuccessfully to have made more particular, read:

"The above company has continually interfered with their employees' rights to self-organization and has made numerous efforts to intimidate and coerce the employees when our organization has made attempts to bargain in their behalf.

"Numerous instances of discrimination against employees can be proven, that will indicate the antagonistic attitude the company is taking against the growth of our local."

The Board's rules require (Art. II, Sec. 4 (c)):

"A clear and concise statement of the facts constituting the alleged unfair labor practice affecting commerce, particularly stating the names of the individuals involved and the time and place of occurrence."

Corrugated repeatedly renewed its motion for more specific charges, but its motions were overruled.

Wentz testified at length concerning many union matters and negotiations, and his displacement of position, and was cross-examined by Corrugated's counsel.

Corrugated points out that the matter of Wentz' demotion had not been emphasized by anyone, the trial examiner had not even made a finding on the matter, and it was not until the Board's decision was announced that it was acquainted with the facts that Wentz' demotion was a basis of the charge of interference, coercion, and restraint of its employees. The Board, on the other hand, claims there was no denial of due process to Corrugated, in that it cross-examined the employee Wentz; it discussed the matter in its brief before the trial examiner. It claims that charges phrased in similar generalities have been upheld. Corrugated at no time asked for a continuance to better prepare itself to meet the Wentz issue.

■ While orderly procedure should be adopted and followed, which in turn necessitates formal charges clearly stated, and the salutary rule of the Board requiring definiteness of allegation of charge, it is clear that in the instant case Corrugated suffered no prejudice in not being informed with greater particularity that one of its unfair practices was the demotion of employee Wentz. On direct examination of a witness, the trial examiner interrupted to ascertain why the witness was thus being interrogated, and the Board's counsel pointed out its materiality lay in an explanation of the witness' transfer from one job to another. Corrugated's counsel cross-examined this witness at length bringing out that the employee substituted in his place was senior in rank to him, with the consequent right to the better position. If the Company were surprised at this evidence, it might have asked for a continuance in which to prepare rebuttal evidence to overcome its significance. No error is here disclosed.

■ *Posting of Notices.* Corrugated's objection to the posting of a notice that it would cease and desist from actions which it was ordered to stop, "because that constitutes an admission of guilt," and its request that we should simply require it to post a copy of the order and state that it would comply, address themselves to the discretion of the Board. We are of the opinion that the contents of the notice is for the Board to determine. Unless there is an abuse of discretion, we will not disturb it. National Labor Relations Board v. Falk Corp., 7 Cir., 102 F.2d 383; Id., 60 S.Ct. 307, 84 L.Ed. ——, decided Jan. 2, 1940. Undoubtedly there are cases where the words objected to are more appropriate and justifiable than in other cases where the condemned action is not deliberately and wilfully violative of the law. A wise and considerate exercise of its authority is necessary to full appreciation of the soundness and wisdom of the Board's orders on the merits of the hotly contested controversies with which it deals.

■ *Activity of Company in Respect to Henry Markins.* The question here presented involves the construction of sections of the Act which grant to the employee the right to "form, join, or assist labor organizations" and "to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection." (Secs. 7 and 8, 29 U.S.C.A. §§ 157, 158.) Employee Markins was a district official of the union and as such represented employees of another company in their collective bargaining efforts with their employer, who, unfortunately for Corrugated, was its customer and

874

withdrew its business from Corrugated because of Markins' activities. While Corrugated's reaction in chastising and even threatening its employee whose acts caused it real economic loss is readily understandable, it is not reconcilable with the above sections.

■■ The Wagner Act will not be construed to have so narrow a scope as to protect union activities only in the inter-relation between the employees and employer of one company. Unionism on a national scope is too well a recognized fact to confine legal protection solely to intra-company relations. Unions would gain little bargaining ability if they were protected solely in company units.

On the other hand, an impartial observer is inclined to question the judgment, the wisdom, and the common sense of a union member employee who carries his union activities to the partisan and offensive extreme of causing his employer's customer to cancel its orders. By so doing he not only injures his employer but also his fellow employees. Labor controversies, however, may be such that the principle involved can only be vindicated by the employee's action offensive to a customer. On the other hand, they may be such as to invite the belief that the employee's case is one of exaggerated ego accompanied by lack of "horse" sense, in which case the employer is justified in discharging the employee. In either case it is a factual controversy, determinable by the trier who must approach its solution on the assumption that the employee's right to join and participate in union activities outside his own employment is clear.

■ At the same time the trier of facts (the examiner and the Board) must look the facts in the face and realize that an employer may reprimand, demote or discharge an employee for cause. There is always present a danger (which must be guarded against) of mistaking the protestation of a discharged employee that his union activities brought about his dismissal, for the real cause, which was disloyalty, indifference, and inefficiency.

■ As to the merits of the controversy—the alleged unfair labor practices—as to which the Board made findings against petitioner, we have laboriously gone through the record and reached the conclusion that there is substantial evidence to support the finding that petitioner was guilty as charged. We will not attempt to state this testimony for its length is prohibitive.

The numerous decisions[3] of the Supreme Court in somewhat similar labor cases have solved many of the legal questions which were related to this phase of labor cases. We have been given a specific illustration of what constitutes substantial evidence sufficient to support the finding of unfair labor practices. National Labor Relations Board v. Waterman Steamship Corp., 60 S.Ct. 493, 84 L.Ed. ——, decided Feb. 12, 1940.

With all legal questions out of the way, we have for determination the question of the existence of substantial evidence to support the Board's finding. After struggling with the evidence on this question we have become convinced that it meets the test laid down in the above-cited cases.

■ The action of petitioner in employing Pinkerton detectives to ascertain the activities of the union and the doings of the employees who were members of the union is not unlike that discussed and criticized in Consolidated Edison Company v. National Labor Relations Board, 305 U.S. 197, 230, 59 S.Ct. 206, 83 L.Ed. 126.

The relief sought by the petitioner must be denied. An order of enforcement will be entered in accordance with the views presented in this opinion.

3 Cases on Substantial Evidence. Consolidated Edison v. Labor Board, 305 U. S. 197, 59 S.Ct. 206, 83 L.Ed. 126; Int. Bro. Elec. Workers v. Labor Board, 304 U.S. 555, 58 S.Ct. 1041, 82 L.Ed. 1524; Nat. Labor Rel. Bd. v. Columbian Co., 306 U.S. 292, 59 S.Ct. 501, 83 L.Ed. 660; Nat. Labor Rel. Bd. v. Waterman Steamship Co., 60 S.Ct. 493, 84 L.Ed. ——, decided Feb. 12, 1940; Nat. Labor Rel. Bd. v. Greyhound Lines, 303 U.S. 261, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307; Nat. Labor Rel. Bd. v. Fansteel Metallurgical Corp., 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599.