[No. D003857. Fourth Dist., Div. One. Feb. 11, 1987.]

CYNTHIA McPHERSON, Petitioner, v.
PUBLIC EMPLOYMENT RELATIONS BOARD, Respondent;
CARLSBAD UNIFIED SCHOOL DISTRICT, Real Party in Interest.

294

**COUNSEL**

Mocine & Eggleston and Mary H. Mocine for Petitioner.

Christine Bleuler, Kirsten L. Zerger, Ramon Romero, Diane Ross, Peter A. Janiak, Madalyn J. Frazzini, E. Luis Saenz, Maureen C. Whelan, Marcia L. Meyers, Marci B. Seville, William C. Heath, Harry J. Gibbons, Jr., Gary P. Reynolds and Howard Schwartz as Amici Curiae on behalf of Petitioner.

Jeffrey Sloan and Andrea L. Biren for Respondent.

Biddle & Hamilton and Christian M. Keiner for Real Party in Interest.

Talmadge R. Jones and Edmund K. Brehl as Amici Curiae on behalf of Respondent and Real Party in Interest.

**OPINION**

**BUTLER, J.**—The Carlsbad Unified School District (District) employed Cynthia McPherson as a secretary. The District refused to upgrade her to a confidential secretary position and transferred her from the employee relations office, which is responsible for union negotiations, to a high school. McPherson claimed the upgrade refusal and the transfer constituted discrimination on the basis of her union activities. The Public Employment Relations Board (PERB) upheld the District decision and denied McPherson any relief. We remand for further proceedings.

## The PERB Decision

*Facts*

The District employed McPherson as a secretary intermittently since 1953 and full-time since 1977. She held the position of secretary III in the personnel department from July 1980 until June 1, 1982. During the period February 1981 through February 1982, the position of personnel director was vacant and McPherson handled all of the work of the personnel office.

In February 1982 District hired David Bates as director of employee relations. Bates had previously represented teachers and had worked for teachers' unions as a labor relations specialist. He had never previously held an administrative position. Before Bates' arrival, labor relations functions, including collective bargaining, had been performed by the assistant superintendent's office. Bates assumed those labor relations functions in addition to the personnel functions previously performed by the personnel department. When Bates was hired, McPherson became his secretary.

On February 8, 1982, his first day at work, Bates prepared a memo addressed to Superintendent Grignon recommending McPherson's position be reclassified from secretary III to secretary III (confidential).[1] The reason given for this reclassification was: "Because the Director of Employee Relations is now the negotiator for the District, and the personnel secretary's assigned responsibilities include 'access to and knowledge of the District's employer/employee relations,' the position qualifies as a confidential position . . . ."[2]

Superintendent Grignon received Bates' memo and submitted his recommendation to a closed session of the board of trustees (Board) on February 17, 1982. The Board rejected the reclassification. Grignon testified the Board had a vehement negative reaction to Bates' recommendation.

Grignon testified that he personally had the following concerns regarding McPherson as a confidential secretary which he communicated to the Board: "Well, I think I should differentiate between the skills that the person has

---

[1]The job description of a secretary III position provides in relevant part: "Employees in this classification may be assigned to responsibilities that involve access to and knowledge of the district's employer/employee relations and attendance at collective bargaining sessions between the district's negotiator and employee organizations. Employees who are assigned this specific responsibility will be classified as Confidential Employees."

Confidential secretaries earned $296 per month more than nonconfidential secretary III's.

[2]During the period that McPherson worked for Bates, particularly in April 1982 part of her duties included typing the District's collective bargaining proposals and work relating to grievances filed by District employees.

and the advisability of her in that position. I think that Mrs. McPherson has good secretarial skills, that she takes shorthand well, she types well. But, however, as far as confidentiality there was my concern. She's been a long-term member of this community. Her ex-husband is a teacher, she has carried out work in the past for the teachers union, in fact, at that time she was typing documents for the teachers union. And so therefore I felt that the position was too sensitive to appoint her given all that knowledge ... [¶] Again, we deal with very confidential materials that we want to stay there that we do not want broadcasted in the community or even slipped to the community and in my opinion I did not feel that Cynthia McPherson could carry out that function." (Fn. omitted.)

Grignon testified that he told McPherson after the Board meeting the Board would not accept her as a confidential secretary because of the possibility she would leak information and her possible conflict of interest.

In an effort to obtain the reclassification, McPherson and the union jointly agreed that the union would appoint McPherson to its negotiating committee. On March 22, 1982, the union sent a letter to Bates announcing McPherson's appointment to the negotiating committee.

When Bates received the letter, he went to the superintendent's office and upon returning, he informed McPherson *she* could serve on the negotiating committee but *his secretary* could not. McPherson immediately agreed to withdraw from the committee to give the Board time to clarify whether or not her position would be reclassified to a confidential position. McPherson testified that she withdrew from the negotiating committee because she did not want to jeopardize her position as secretary and did not want to do what was wrong.

On April 22, 1982, McPherson sent a memorandum to the District's personnel commission requesting reclassification as well as out-of-class pay for the period during which she had performed the work of confidential secretary. On April 23, McPherson sent a memo to Grignon making the same request and advised him of her request to the personnel commission. Grignon responded that confidential secretaries were overpaid and that his position was that she should get only a stipend of $50 per month retroactive to February 8, 1982.

Three days later, on April 26, 1982, the classified personnel commission considered McPherson's request and supported it in its entirety. On the same day, Grignon sent a memo to the director for classified personnel requesting that interviews be scheduled for the position of secretary III (confidential) to replace the secretary III position held by McPherson. Bates did not

contemplate that McPherson's position would be opened for interviews if it was reclassified. McPherson testified that historically, secretaries assuming new functions involving employee relations were reclassified as confidential; interviews were not held.

The commission questioned the superintendent's reasons for scheduling interviews for the position of secretary to the director of employee relations when that position was currently filled by McPherson. Grignon responded that only the Board and not the personnel commission had the authority to determine whether or not an employee had confidential status; furthermore, since McPherson had never been appointed as a confidential employee, she was owed no out-of-class backpay.

On April 27, McPherson and eight other District employees were notified of the interviews for the new position. On April 28, McPherson responded by letter that she would interview under protest. On the same date she sent a memo to Bates asking the reasons that interviews were being conducted for the position she then held. Bates responded that he did not know what was happening. He suggested she speak to Grignon.

McPherson was interviewed for the position of secretary III (confidential) on May 4, 1982. The District offered the position to an applicant who subsequently declined the appointment. No other offers were made. Grignon testified that the candidate who was offered the job was chosen because she was a court reporter and could operate a shorthand machine. Ability to operate a court reporter machine was not included within the job specifications for the position.

On May 5, 1982, Grignon sent a memorandum to the Board recommending that the pay premium for confidential employees be reduced from $296 per month to $50 per month over the salary for a nonconfidential position at the same level.

The change in salary for confidential secretaries was approved and became effective June 1, 1982. On June 1, 1982, there was no one in the school district employed as a secretary III (confidential).

On May 17, 1982, McPherson was notified that she would be involuntarily transferred from her position as secretary III for the director of employee relations to the position of secretary III for the principal at Carlsbad High School, a lateral transfer, effective June 1, 1982. The reason given for the transfer was "for the good of the District."

Grignon testified that McPherson was transferred at the beginning of June because the principal of the high school had requested a permanent secretary

during the first week in May. Grignon testified that he consulted with Bates before transferring McPherson and that Bates had "requested the transfer" because of the need for a secretary at the high school. Bates testified that he did not request McPherson's transfer and that Grignon did not tell him the reasons for the transfer.

The principal of Carlsbad High School testified that she had been requesting a permanent secretary since her secretary became ill in September or October 1981. Her last request had been just prior to April 12, 1982, which was the earliest date that her previous secretary could legally be replaced.

On June 7, 1982, McPherson filed an unfair practice charge with PERB complaining of the District's refusal to permit her to be on the union negotiating committee.

On June 16, 1982, McPherson filed an unfair practice charge with PERB complaining of the transfer.[3]

From the date of McPherson's transfer on June 1 until sometime in October 1982, her position was filled by a succession of eight temporary secretaries. McPherson testified that in the period between June 1 and July 12 she received 67 calls from both Bates and the temporary secretaries asking her questions about how to do things in her previous position. Bates acknowledged that he made several such calls to McPherson. The calls continued until and even after someone was hired to work for Bates in October.

On July 7, 1982, Grignon proposed to the Board that the position of secretary III (confidential) to the director of employee relations be replaced by a new position, credentials-personnel technician (CPT).

On August 3, 1982, McPherson filed an additional unfair practice charge complaining of the District's discrimination when she attempted to be properly classified, through opening her position to interviews, transferring her and finally changing the job title.

On August 26, 1982, McPherson took a written test for the CPT position. She received the highest score of the five applicants. The candidates who

---

[3]On June 8, 1982, McPherson had filed a grievance under the parties' collective bargaining agreement protesting her involuntary transfer. The grievance has reached the arbitration stage and is currently in abeyance pending resolution of this unfair practice charge. The arbitration provision in the contract provides for advisory arbitration only and provides that the final decision on any grievance shall be made by the Board.

received the three highest scores were interviewed in September and one of those three, other than McPherson, was chosen for the position.[4]

No evidence was introduced regarding the qualifications of the person ultimately hired.

*PERB Decision*

Rejecting the decision of the administrative law judge in favor of McPherson, PERB decided McPherson as the charging party did not carry her burden of proving her conduct upon which the District's action was based was protected activity within the Educational Employment Relations Act (EERA). PERB interpreted Government Code section 3543 as protecting only employee organizational activities for the purpose of representation, noting the statutory language confers on public school employees the right to "form, join, and participate in the activities of employee organizations of their own choosing for the purpose of representative . . . ." (Gov. Code,[5] § 3543.) The teachers union, for which McPherson performed typing, is not and may not legally be the unit to which McPherson belongs; hence, PERB concluded her activity on behalf of this separate union is not protected conduct and may form the motive for the employer's actions.

PERB rejected the interference claim based on Bates' refusal to have "his" secretary serve on the union negotiating committee because (1) District's alleged discriminatory conduct antedated this episode by several months and could not therefore have motivated Bates' conduct, and (2) there is insufficient evidence to show antiunion animus on Bates' part, in light of his supportive activity regarding McPherson (having actively sought her reclassification as his confidential secretary) and thus, PERB concluded, Bates' statement does not rise to the level of a violation of law nor does it show any basis for the other charges of unfair labor practices nor transfer. PERB concluded, in a 2-to-1 decision, McPherson failed to show she had participated in EERA-protected activity or that such participation was the underlying motivation of District actions adverse to her interests.

Dissenting member Morgenstern (partly concurring) "vehemently" disagreed with the conclusion McPherson's activity on behalf of a fellow employees' union did not constitute conduct protected by EERA. Citing National Labor Relations Act (NLRA) precedent under section 7 of that act, Morgenstern maintained McPherson engaged in protected activity when she

---

[4]Personnel commission rules permit the District to appoint any one of the top three candidates to the position.

[5]All statutory references are to the Government Code unless otherwise specified.

typed documents for the teachers union, when she was appointed to her union's negotiating committee, and when she sought to exercise her rights under the contract and civil service rules.

However, despite this disagreement, Morgenstern concurred in the result because he believed District was entitled to discriminate on the basis of protected union activity in selecting a confidential employee. He said: "because the rewards are fewer and the obligation to remain tight-lipped so basic and absolute, a management desire to exercise extreme and unusual caution in choosing confidential employees is not unreasonable."

However, he concluded although District was therefore justified in refusing McPherson reclassification or appointment as a confidential secretary, this justification did not excuse its refusal to pay her a salary differential of $296 per month for the period February to June 1982 when she was in fact engaged in doing confidential work. Likewise, no management interest justified her transfer. Her transfer long before any confidential employee was actually appointed to the position was premature and punitive.

Finally, Morgenstern believed, in agreement with the administrative law judge, that Bates violated the Act by refusing to permit McPherson to serve on the negotiation committee. This being a direct interference with representational rights, no further showing of motive was necessary. However, Morgenstern said the violation was de minimis because Grignon corrected Bates immediately upon becoming aware of the matter.

### Decision of Administrative Law Judge

The administrative law judge prepared a lengthy (53-page) decision analyzing the applicable law and setting out the evidence. ■ She stated the standard of review for PERB, as in National Labor Relations Board (NLRB) proceedings, is that the charging party has the burden of showing protected conduct was a motivating factor in the employer's decision, but once that is established, then the burden shifts to the employer to establish the affirmative defense that despite the antiunion motivation the employment decision would have been taken anyway, for other, legitimate business reasons. In support of this correct statement of the standard she cites the seminal decision in *Wright Line, A Division of Wright Line, Inc.* and *Bernard R. Lamoureux* (Aug. 27, 1980) 105 L.R.R.M. 1169, 1171-1173 [251 N.L.R.B. No. 150], enforcement granted *N.L.R.B.* v. *Wright Line, A Div. of Wright Line,* (1st Cir. 1981) 662 F.2d 899, certiorari denied (Mar. 1, 1982) 455 U.S. 989 [71 L.Ed.2d 848, 102 S.Ct. 1612], followed, and conflicting decisions disapproved, in *NLRB* v. *Transportation Management Corp.* (1983) 462 U.S. 393 [76 L.Ed.2d 667, 103 S.Ct. 2469]. (See also *Mt. Healthy*

*City Board of Ed.* v. *Doyle* (1977) 429 U.S. 274, 287 [50 L.Ed.2d 471, 483-484, 97 S.Ct. 568]; *Abatti Farms, Inc.* v. *Agricultural Labor Relations Bd.* (1980) 107 Cal.App.3d 317, 335 [165 Cal.Rptr. 887] [conc. opn. of Staniforth, J.]; *Martori Brothers Distributors* v. *Agricultural Labor Relations Bd.* (1981) 29 Cal.3d 721, 730 [175 Cal.Rptr. 626, 631 P.2d 60].)

She found the uncontradicted evidence showed Grignon's entire course of conduct was based on McPherson's protected activity. Accordingly, all subsequent District conduct including denial of promotion, transfer, denial of appointment to the credentials-personnel technician position, and refusal of opportunity to serve on the bargaining committee, were taken solely because of McPherson's protected union activity and therefore constituted violations of the unfair labor practices defined in section 3543.5, subdivision (a). (Additionally, the refusal of permission to serve on the union committee was held to be a violation of § 3543.5, subd. (b), because it denied the union's right to choose its own representatives.)

With respect to District's position it was entitled to discriminate against union activists in choosing a confidential employee, the administrative law judge found no directly relevant precedent under the NLRA or elsewhere, but, by analogy to decisions dealing with choice of supervisorial or managerial employees, concluded the District was not entitled to engage in such discrimination, amounting to a presumption a past loyal employee of many years service could not be trusted in a confidential position.

The administrative law judge recommended, as remedy, McPherson be offered the position of credentials-personnel technician in the office of the director of employee relations, with backpay for all periods during which she should have held that position or the position of a confidential secretary, as well as the posting of a cease and desist order and related relief.

*Effect of the Administrative Law Judge Decision; Standard for Our Review*

Section 3542, subdivision (c) states our standard of review of PERB decisions is whether substantial evidence on the record considered as a whole supports the PERB findings. (See *San Mateo City School Dist.* v. *Public Employment Relations Bd.* (1983) 33 Cal.3d 850, 856 [191 Cal.Rptr. 800, 663 P.2d 523].) ■ This is a well-understood and much discussed standard in review of decisions of the NLRB in the federal circuit courts as well as review of the Agricultural Labor Relations Board (ALRB) in California Courts of Appeal. (*Universal Camera Corp.* v. *Labor Bd.* (1951) 340 U.S. 474, 488 [95 L.Ed. 456, 467-468, 71 S.Ct. 456]; *Tex-Cal Land Management, Inc.* v. *Agricultural Labor Relations Bd.* (1979) 24 Cal.3d 335 [156 Cal.Rptr.

1, 595 P.2d 579]; cf. Lab. Code, § 1160.8 with § 3542, subd. (c).) The standard does not change when the NLRB has reversed the decision of the administrative hearing officer, for the NLRB, not the hearing officer, is the ultimate fact finder, entitled to draw inferences from the available evidence. (*Universal Camera Corp.* v. *Labor Bd., supra,* at p. 496 [95 L.Ed.2d at pp. 471-472]; *N.L.R.B.* v. *Pacific Grinding Wheel Co., Inc.* (9th Cir. 1978) 572 F.2d 1343, 1347.) "The statutorily mandated deference to findings of fact 'runs in favor of the Board, not in favor of the initial trier-of-facts, the administrative law judge.'" (*Abatti Farms, Inc.* v. *Agricultural Labor Relations Bd., supra,* 107 Cal.App.3d at p. 336 [conc. opn. of Staniforth, J.], quoting from *Penasquitos Village, Inc.* v. *N.L.R.B.* (9th Cir. 1977) 565 F.2d 1074, 1076.) Accordingly, although entitled to some weight, the administrative law judge's factual findings, even demeanor-based credibility findings, are not conclusively binding on the NLRB. (*Ibid.; Universal Camera Corp.* v. *Labor Bd., supra,* 340 U.S. at pp. 496-497 [95 L.Ed. at pp. 471-472].)

■ Further, as the administrative hearing officer correctly observed, the test of employer conduct in a mixed motive situation, where legitimate business reasons arguably concur with anti-union motivations as the basis for an employment decision, is a "but for" test—whether the discharge or other violation of protected activity would have occurred anyway regardless of the improper antiunion motivation. This is an affirmative defense which the employer must establish by a preponderance of the evidence, once the charging party has proved antiunion animus played any part in the decision. (This "but for" test, with its attendant shifting of the burden of proof, has been approved by the United States Supreme Court, for review of the NLRB, in *NLRB* v. *Transportation Management Corp., supra,* 462 U.S. 393, approving *Wright Line, supra,* 662 F.2d 899; and has been adopted in reviewing ALRB decisions, see *Martori Brothers Distributors* v. *Agricultural Labor Relations Bd., supra,* 29 Cal.3d at p. 730; see also *Royal Packing Co.* v. *Agricultural Labor Relations Bd.* (1980) 101 Cal.App.3d 826, 834 [161 Cal.Rptr. 870]. This rule also appears to have been adopted by PERB; see *College and University Service Employees/Service Employees International Union, AFL-CIO* v. *California State University, Sacramento* (Apr. 30, 1982) PERB Dec. No. 211-H, at pp. 13-14; *Novato Federation of Teachers, Local 1986, AFT, AFL-CIO* v. *Novato Unified School District* (Apr. 30, 1982) PERB Dec. No. 210, at pp. 4-5.)

Finally, although as stated the ultimate fact finder is PERB, the lengthy and thoughtful decision by the administrative law judge perhaps deserves the following comment, made of an ALRB decision: "[the decision] documents *its* own credibility findings with a detailed factual summary and a thoughtful evaluative analysis of the evidence presented on the entire record. Such decision carries its own badges of reliability." (*Abatti Farms, Inc.* v.

*Agricultural Labor Relations Bd., supra,* 107 Cal.App.3d at p. 345, original italics [conc. opn. of Staniforth, J.].)

I. *Whether McPherson Was Engaged in Protected Conduct*

 PERB found McPherson had not proven her union activities fell within the purview of section 3543.5 and they were therefore unprotected.

Section 3543.5 in pertinent part provides: "It shall be unlawful for a public school employer to:

"(a) Impose or threaten to impose reprisals on employees, to discriminate or threaten to discriminate against employees, or otherwise to interfere with, restrain, or coerce employees because of their exercise of rights guaranteed by this chapter.

"(b) Deny to employee organizations rights guaranteed to them by this chapter."

The Public Employment Relations Act is similar in many ways to the NLRA. (*San Diego Teachers Assn.* v. *Superior Court* (1979) 24 Cal.3d 1, 12 [154 Cal.Rptr. 893, 593 P.2d 838].) For example, section 3540 provides: "It is the purpose of this chapter to promote the improvement of personnel management and employer-employee relations within the public school systems in the State of California by providing a uniform basis for recognizing the right of public school employees to join organizations of their own choice, to be represented by such organizations in their professional and employment relationships with public school employers, to select one employee organization as the exclusive representative of the employees in an appropriate unit, and to afford certificated employees a voice in the formulation of educational policy."

Section 3543 provides: "Public school employees shall have the right to form, join, and participate in the activities of employee organizations of their own choosing for the purpose of representation on all matters of employer-employee relations. . . ."

Section 7 of the NLRA provides: "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, . . ."

The Department of Personnel Administration of the State of California has filed an amicus brief in which it argues the legislative purpose in enacting

the EERA was to provide school employees with the right to organize for representational purposes but not for "other mutual aid and protection." It argues removal of the quoted language from the bill during the legislative process implied an intent to make NLRB precedent inapplicable or at least to draft a narrower statute than section 7 of the NLRA.

*Modesto City Schools* v. *Modesto Teachers Association, CTA/NEA* (Mar. 8, 1983) PERB Decision No. 291, at page 62 observes: "The only difference we find between the right to engage in concerted action for mutual aid and protection and the right to form, join and participate in the activities of an employee organization is that EERA uses plainer and more universally understood language to clearly and directly authorize employee participation in collective actions traditionally related to the bargaining process." However, that decision and others cited here in support of a "generous interpretation" of the language of the EERA, arose in the context of such rights as right to be represented by one's own union in a disciplinary matter or to strike or engage in activity vis-à-vis one's own unit rather than that of alleged discrimination based on protected activity on behalf of a sister union. (See, e.g., *Redwoods Community College Dist.* v. *Public Employment Relations Bd.* (1984) 159 Cal.App.3d 617, 623-624 [205 Cal.Rptr. 523] [EERA confers broader rights than the NLRA regarding the right to be repre-sented by one's union at a disciplinary proceeding, comparing EERA language that employee organizations shall have the right to represent their own members in their employment relations (§ 3543.1, subd. (a)) with language in § 7 of the NLRA that employees shall have the right to engage in other concerted activities for the purpose of collective bargaining or other mutual aid and/or protection]; *Robinson* v. *State Personnel Bd.* (1979) 97 Cal.App.3d 994, 1001 [159 Cal.Rptr. 222]; *Civil Service Assn.* v. *City and County of San Francisco* (1978) 22 Cal.3d 552 [150 Cal.Rptr. 129, 586 P.2d 162].) Certainly, there are marked similarities between the EERA and the NLRA (see *San Diego Teachers Assn.* v. *Superior Court, supra,* 24 Cal.3d at p. 12 [issue of exclusive initial jurisdiction of PERB]); but the language of the two statutes is not identical, and specifically, section 7 of the NLRA, *supra,* refers to the right to engage in "other concerted activities for the purpose of collective bargaining or other mutual aid or protection," directly protecting activity on behalf of sister unions, whereas this language is not to be found in sections 3540 or 3543, *supra*. ■ Nor do the decisions mandate identical interpretations of these similar legislative schemes; rather, it is appropriate for PERB to take guidance from the NLRA precedent *when applicable* to public sector labor relations issues. (*Fire Fighters Union* v. *City of Vallejo* (1974) 12 Cal.3d 608, 616 [116 Cal.Rptr. 507, 526 P.2d 971]; *Los Angeles County Civil Service Com.* v. *Superior Court* (1978) 23 Cal.3d 55, 63 [151 Cal.Rptr. 547, 588 P.2d 249] [NLRA is persuasive precedent in interpreting the Meyers-Milias-Brown Act (§ 3500 et seq., hereafter MMBA),

a less comprehensive labor relations scheme similiar to the EERA]; see also *Public Employees Assn.* v. *Board of Supervisors* (1985) 167 Cal.App.3d 797, 806-807 [213 Cal.Rptr. 491] [applies NLRA precedent in interpreting parallel language in the MMBA, saying we should look to the federal case law in applying the statute because it is "patterned closely" after a section of the NLRA].)　　　Here, however, not only are the statutes not identical, there is an omission of critical language found in section 7 of the NLRA from the EERA, an omission which was made during the process of amending the bill before its passage and which was possibly intentional.[6]

In an analogous area, the administration of the Agricultural Labor Relations Act (ALRA), although there a statute (Lab. Code, § 1148) specifically prescribes following NLRA precedent ("The board shall follow applicable precedents of the National Labor Relations Act, as amended"), nevertheless the California Supreme Court has held the reference to *applicable* precedent means just that, and authorizes administrative choice of different principles when the differences are justifiable in light of the special requirements of protecting labor/management relations in the context of agricultural labor. (See *Agricultural Labor Relations Bd.* v. *Superior Court* (1976) 16 Cal.3d 392, 412-413 [128 Cal.Rptr. 183, 546 P.2d 687].) The court said the ALRB was mandated to "select and follow only those federal precedents which are relevant to the particular problems of labor relations on the California agricultural scene." (*Id.* at p. 413; see also *Cadiz* v. *Agricultural Labor Relations Bd.* (1979) 92 Cal.App.3d 365, 374 [155 Cal.Rptr. 213].) Further, a decision whether or not to depart from federal precedent in administering a state labor law ought to be first considered by the administrative agency itself, here PERB, which possesses the expertise and sensitivity to problems peculiar to

---

[6]The legislative history of the EERA is complex. The first comprehensive public sector labor relations law, the George Brown Act (Stats. 1961, ch. 1964, § 1, pp. 4141-4142, now §§ 3525-3536) as originally proposed to the Legislature contained the "mutual aid and protection" language of section 7 of the NLRA. (Assem. Bill No. 2375.) However, the fifth numbered amendment to the Assembly Bill, on May 5, 1961, did not contain this language. The bill was eventually passed without such language. (See § 3502.) This language was incorporated verbatim into the later passed Winton Act (Assem. Bill No. 1474 (1965)) providing separate but identical coverage to school district employees (at former Ed. Code, § 13082). The eventual replacing statute, the EERA similarly does not refer to "mutual aid and protection." Also, in 1973, when Assembly Bill No. 2274 was introduced in the Legislature on May 7, 1973, to replace the Winton Act with the EERA, although the Advisory Council had then suggested including statutory language embodying the concept of mutual aid and protection, the legislation, proposing an amendment to Education Code section 13081, did not contain such language but only used the "representational purpose" concept. Accordingly, at least arguably, the history of EERA reflects deliberate legislative choice of the narrower concept of protected activity, as opted for by PERB here. (See, e.g., *Keeler* v. *Superior Court* (1970) 2 Cal.3d 619, 629-630 [87 Cal.Rptr. 481, 470 P.2d 617, 40 A.L.R.3d 420].)

its labor/management relations area and is the agency entrusted with responsibility for overseeing labor relations in its allotted sphere.[7]

On the other hand, the agency may not act in a purely arbitrary fashion. Here, the language of the statutory provisions is dissimilar. However, we find no evidence in the record and no policy considerations stated in the PERB decision which would justify exempting activity on behalf of a sister union from protected activity under the EERA. There has been no attempt to explain why in the context of educational employees the protection should be limited to activity on behalf of one's own bargaining unit, unlike the situation in other industries regulated by the NLRA or the ALRA. As dissenting PERB member Morgenstern says, the well developed body of NLRA precedent protects such activity on behalf of nonaffiliated unions because such activity is intimately related to activity on behalf of one's own union and because as a practical matter it is difficult to separate impermissible anti-union animus arising in these separate but closely related situations. (See *Redwing Carriers, Inc. et al.* (July 20, 1962) 50 L.R.R.M. 1440 [137 N.L.R.B. 1545], enforcement *sub. nom. Teamsters, Chauffeurs & Helpers Local U. No. 79* v. *N.L.R.B.* (D.C. Cir. 1963) 325 F.2d 1011, cert. den. (Apr. 20, 1964) 377 U.S. 905 [12 L.Ed.2d 176, 84 S.Ct. 1165]; *National Labor Relations Board* v. *J. G. Boswell Co.* (9th Cir. 1943) 136 F.2d 585; *National Labor Rel. Bd.* v. *Peter C. K. Swiss Choc. Co.* (2d Cir. 1942) 130 F.2d 503; *Fort Wayne Corrugated P. Co.* v. *National L.R. Board* (7th Cir. 1940) 111 F.2d 869.) This soundly reasoned NLRB precedent recognizes the principle that interunion solidarity strengthens the position of all employees and is fundamental to the furtherance of labor organization. Judge Learned Hand expressed it well: "When all the other workmen in a shop make common cause with a fellow workman over his separate grievance, and go out on strike in his support, they engage in a 'concerted activity' for 'mutual aid or protection,' although the aggrieved workman is the only one of them who has any immediate stake

---

[7]Accordingly, *San Diego Teachers Assn.* v. *Superior Court, supra,* 24 Cal.3d 1, places initial decisional jurisdiction in PERB regarding strikes alleged to be unfair practices: " . . . Neither federal nor state courts may grant relief on grounds that arguably would justify an NLRB remedy against an unfair practice (29 U.S.C. §§ 158, 160) without deferring to the exclusive initial jurisdiction of the NLRB. (*Sears, Roebuck & Co.* v. *Carpenters* [(1978)] 436 U.S. 180, 186-188, 198 [56 L.Ed.2d 209, 219, 226 (98 S.Ct. 1745)]; *San Diego Unions* v. *Garmon* (1959) 359 U.S. 236, 245 [3 L.Ed.2d 775, 783, 79 S.Ct. 773].) The aim of that rule is to help bring expertise and uniformity to the delicate task of stabilizing labor relations. (*Motor Coach Employees* v. *Lockridge* (1971) 403 U.S. 274, 286-288 [29 L.Ed.2d 473, 482-484, 91 S.Ct. 1909]; *Garner* v. *Teamsters Union* (1953) 346 U.S. 485, 490-491 [98 L.Ed. 228, 239-240, 74 S.Ct. 161].) Though the rule as it relates to NLRB has been enunciated in the context of conflict between a federal agency and state courts, a like principle applies to parallel conflicts between California agencies and courts. *(United Farm Workers* v. *Superior Court* (1977) 72 Cal.App.3d 268, 273 [140 Cal.Rptr. 87] (declaratory relief unavailable when issue could be raised in ALRB proceeding); cf. *Morton* v. *Superior Court* (1970) 9 Cal.App.3d 977 [88 Cal.Rptr. 533] (police officers' suit over terms of employment precluded by failure to resort to grievance procedure).)" (*San Diego Teachers Assn.* v. *Superior Court, supra,* 24 Cal.3d at p. 12.)

in the outcome. The rest know that by their action each one of them assures himself, in case his turn ever comes, of the support of the one whom they are all then helping; and the solidarity so established is 'mutual aid' in the most literal sense, as nobody doubts. So too of those engaging in a 'sympathetic strike,' or secondary boycott; the immediate quarrel does not itself concern them, but by extending the number of those who will make the enemy of one the enemy of all, the power of each is vastly increased. It is one thing how far a community should allow such power to grow; but, whatever may be the proper place to check it, each separate extension is certainly a step in 'mutual aid or protection.' Cf. Fort Wayne Corrugated Paper Co. v. National Labor Relations Board, 7 Cir., 111 F.2d 869, 873, 874. It is true that in the past courts often failed to recognize the interest which each might have in a solidarity so obtained (e.g. Duplex Printing Press Co. v. Deering, 254 U.S. 443, 471, 472, 474, 41 S.Ct. 172, 65 L.Ed. 349, 16 A.L.R. 196), but it seems to us that the act has put an end to this." (*National Labor Rel. Bd.* v. *Peter C. K. Swiss Choc. Co., supra,* 130 F.2d at pp. 505-506.)

■ Since the early days of the NLRA, it has been recognized that association with, and assistance to, employees outside the bargaining unit is an integral part of normal organizational activities and is therefore protected from employer reprisal. In *Fort Wayne Corrugated P. Co.* v. *National L.R. Board, supra,* 111 F.2d 869, the court held that the employer acted unlawfully in threatening an employee who was acting as a union representative of employees of another employer, since such activity is protected under the Act: "The [NLRA] will not be construed to have so narrow a scope as to protect union activities only in the interrelation between the employees and employer of one company. Unionism on a national scope is too well a recognized fact to confine legal protection solely to intra-company relations. Unions would gain little bargaining ability if they were protected solely in company units." (*Fort Wayne Corrugated P. Co.* v. *National L.R. Board, supra,* at p. 874.)

Regardless of the "other mutual aid or protection" clause of section 7 of the NLRA, protected activity is not limited to association with employees of the same employer or to association with employees represented by the same union. (See also, *Redwing Carriers, Inc. et al., supra,* 50 L.R.R.M. 1440 [137 N.L.R.B. No. 1545], enforcement *sub. nom.; Teamsters, Chauffeurs & Helpers Local U. No. 79* v. *N.L.R.B., supra,* 325 F.2d 1011, cert. den. 377 U.S. 905; *N.L.R.B.* v. *Alamo Express, Inc.* (5th Cir. 1970) 430 F.2d 1032.)

Furthermore, an employee is engaged in protected concerted activity by assisting other labor organizations, even if that employee is the only individual in his or her own bargaining unit who is taking such action. In *Washington State Service Employees State Council No. 18 and Local 6,*

*Service Employees Union, et al.* and *Jill Severn* (Mar. 12, 1971) 76 L.R.R.M. 1467 [188 N.L.R.B. No. 141, p. 957], an employee was discharged for demonstrating against another employer. The NLRB held the employee was engaged in protected concerted activity despite the fact that no other employee from the unit participated in the demonstration. By demonstrating, the employee was acting in concert with the employees of the other employer. The fact that the demonstration was not aimed at the practices of the employee's own employer was irrelevant, since the Act protects against interference with *any* union activity. Similarly, in *A-W Washington Service Station, Inc. et al.* and *Richard Bacon* (Sept. 23, 1981) 108 L.R.R.M. 1097 [258 N.L.R.B. No. 14, p. 164], an employer was found to have unlawfully discharged an employee because he was union president of *another* employer's employees: the fact that he was not organizing the employees of his employer was immaterial, since discrimination based upon activity at *another* employer was unlawful.

 Here, McPherson's work on behalf of the teachers union falls squarely within the parameters of protected activity set forth in these NLRA cases. The fact that there was no evidence that other employees in her unit were also assisting the teachers union does not strip McPherson of protection under the EERA: by doing work for the teachers union, McPherson was acting "in sympathy with" or "in concert with other employees." (*Washington State Service Employees State Council No. 18 and Local 6, Service Employees Union, et al.* and *Jill Severn, supra,* 188 N.L.R.B. No. 141 at p. 959; *A-W Washington Service Station, Inc. et al., supra.*) McPherson's activities in fact had a much more direct bearing on her employer, the District, than those activities described in the NLRA cases, since McPherson's activities were directed at her own employer, as opposed to another employer, albeit on behalf of another group of the District's employees.

PERB also argues its finding McPherson failed to prove she engaged in protected activity is correct because McPherson did not offer specifics as to what she had typed for the teachers union or why she had done the typing.

Grignon testified he knew McPherson had "carried out work in the past for the teachers union," was "typing documents for the teachers union," and that this activity caused him to oppose her reclassification as a "confidential" secretary. Further specifics were not required. Even when an employer is mistaken in believing an employee has engaged in union activity, a violation of the EERA occurs if the employee is discriminated against because of the belief heor she engaged in the protected activity. (*National Labor Relations Board* v. *J. G. Boswell Co., supra,* 136 F.2d 585.)

Contrary to PERB's assertions, NLRA precedent requires no additional evidence. Activity such as that engaged in by McPherson constitutes activity

in association with the union and in concert with other employees, because the employer perceived it as such. Evidence as to the employee's intent in engaging in these activities, or specifics about such activities, is not required. (*Id.* at p. 585.)

■ We conclude, despite differences in statutory language, PERB is not justified in departing from the array of sound NLRA precedent quoted above establishing the parameters of protected conduct in the labor relations context. PERB has given no justifications peculiar to the educational employment sphere to support such departure. Accordingly, as maintained by the administrative law judge and by dissenting PERB board member Morgenstern of PERB, we hold McPherson's activity here on behalf of a fellow employees' union was protected activity under the EERA.

## II. *Discrimination With Reference to a Confidential Employee Position*

Given the statements by Grignon as to why McPherson was not desired as a confidential secretary, there is little doubt District discriminated against her in choosing a confidential secretary. ■ The remaining question is whether an employer can discriminate against an employee on the basis of union activity when the employee seeks to become a confidential employee.

This issue is a sensitive labor relations issue affecting all public sector employees within PERB's jurisdiction. Accordingly, under the statutory scheme of the EERA which reposes exclusive initial jurisdiction in PERB over such matters (see *San Diego Teachers Assn.* v. *Superior Court, supra,* 24 Cal.3d at p. 12; see generally discussion of preemption under the NLRA in such decisions as *Belknap, Inc.* v. *Hale* (1983) 463 U.S. 491 [77 L.Ed.2d 798, 103 S.Ct. 3172] [dis. opn. of Brennan, J.]), we ought not resolve this matter absent PERB analysis and application of policies it finds relevant and appropriate in resolving the matter. (See fn. 7, *ante,* referring to *San Diego Teachers Assn.* v. *Superior Court, supra,* 24 Cal.3d 1.) As the decision of the administrative law judge points out, a considerable body of NLRA precedent protects supervisorial and managerial employees from having their career ladders blocked by antiunion discrimination. (E.g., *Ford Motor Company et al.* and *Dennis Siriani and Douglas West* (Aug. 22, 1980) 105 L.R.R.M. 1143 [251 N.L.R.B. No. 66, p. 413] enforcement vac., remand in pt. *N.L.R.B.* v. *Ford Motor Co.* (6th Cir. 1982) 683 F.2d 156; *National Labor Relations Board* v. *Bell Aircraft Corp.* (2d Cir. 1953) 206 F.2d 235, 237; *Advanced Mining Group, Division of Republic Corp., Lucerne Facility* and *Steelworkers, AFL-CIO, CLC* (Feb. 25, 1982) 109 L.R.R.M. 1281 [260 N.L.R.B. No. 73, p. 486]; see also *Herrin* v. *Lemoore Union High School District* (Dec. 28, 1982) PERB Dec. No. 271, at p. 2.) On the other hand, we recognize a need for employer discretion in making employment decisions affecting high level

employees. (See, language in *Pugh* v. *See's Candies, Inc.* (1981) 116 Cal.App.3d 311, 330 [171 Cal.Rptr. 917].) *Pugh, supra,* says " . . . where, as here, the employee occupies a sensitive managerial or confidential position, the employer must of necessity be allowed substantial scope for the exercise of subjective judgment." (*Ibid.*) Also, as dissenting member Morgenstern notes, there are very few confidential positions as compared to managerial/supervisory positions (citing *Sierra Sands Unified School District* (1976) EERB Dec. No. 2); confidential status is not a significant step on the promotional ladder in the educational employment relations context and permitting choice of a confidential employee to turn on union-related activity might not exert a serious chilling effect on the exercise of employee bargaining rights.

Since only one of the PERB members deciding this matter actually addressed this issue, we think it appropriate to remand so the agency may consider whether McPherson's clearly protected union activity may nevertheless constitute a legitimate business justification for discrimination against her in the hiring of a confidential employee.

III. *Negotiating Committee*

■ PERB found no unfair practice in denial of McPherson's request to be on the negotiating committee because PERB considered the refusal only in the context of evidence of antiunion motivation on the issue of McPherson's transfer from her position.

When McPherson requested permission to be on the negotiating committee, she was told by her employer she could be if she wished, but no secretary of his was going to be. Clearly, this was an implied threat to remove her from her position if she was on the committee and directly interfered with her right to engage in labor relations activity. However, if McPherson was a "confidential employee" when this interference occurred, it was not unlawful because, as a confidential employee, she did not have a right to represent the union on the negotiating committee.

Section 3543 grants the right to engage in labor relations activities to "public school employees." Section 3543.4 prevents a "confidential employee" from being represented by a union but it does not otherwise deny "confidential employees" the rights guaranteed by section 3543.5. If McPherson was a "confidential employee" during the spring of 1982, she could file an unfair practice charge but could not be represented by the union which represented other employees.

Generally, a negotiating committee can be comprised of whomever the employees choose. (*Racine Die Casting Co., Inc. et al.* and *International*

*Union, United Automobile & Aerospace/Agricultural Implement Workers of America (UAW) Local 627* (Aug. 4, 1971) 77 L.R.R.M. 1818 [192 N.L.R.B. No. 73., p. 529.) However, because a "confidential employee" is part of the nucleus of the management negotiating team, a "confidential employee" cannot also represent employees at negotiations. Accordingly, on remand, PERB should decide whether McPherson was a "confidential employee" in the spring of 1982.

*Conclusion*

We remand this matter to PERB, which shall decide (1) whether District refused McPherson's reclassification to a confidential position because of activity this court has found protected under EERA, (2) if so, whether the District had legitimate business reasons for refusing to reclassify McPherson. To make this determination, PERB should decide whether in choosing a confidential employee, the District may lawfully decide against an applicant because the applicant has engaged in activity protected by the EERA, (3) whether the District transferred McPherson from her former position with the employment relations office to a high school because of activity this court has found protected, (4) if so, whether the District would have transferred McPherson anyway for a legitimate business reason, and (5) whether the District interfered with McPherson's EERA rights by refusing to permit her to be on the negotiating committee.[8]

Kremer, P. J., and Work, J., concurred.

Petitions for a rehearing were denied February 26, and March 11, 1987, and the petitions of respondent and real party in interest for review by the Supreme Court were denied May 13, 1987. Kaufman, J., was of the opinion that the petitions should be granted.

---

[8]In the proceeding before this court, PERB has conceded the interference claim based on Bates's statement to McPherson was not adequately addressed in its decision and has requested remand for further consideration of this point. PERB counsel says the decision was ambiguous as to whether Bates's statement was analyzed as a reprisal or an act of interference. Claiming PERB is both willing and able to apply the correct legal standard to these facts, PERB requests remand of the interference claim to decide whether Bates's statement constituted a violation of section 3543.5, subdivision (a) (unlawful interference). Such remand, it argues, is in the interest of the development of a cohesive body of administrative law on interference.