Filed 1/9/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| VISALIA UNIFIED SCHOOL DISTRICT,<br><br>Petitioner,<br><br>v.<br><br>PUBLIC EMPLOYMENT RELATIONS BOARD,<br><br>Respondent;<br><br>CALIFORNIA SCHOOL EMPLOYEES ASSOCIATION,<br><br>Real Party in Interest. | F084032<br><br>(PERB Dec. No. 2806-E,<br>Case No. SA-CE-2979-E)<br><br><br>**OPINION** |

-ooOoo-

ORIGINAL PROCEEDINGS; petition for writ of review.

Lozano Smith, Sloan R. Simmons, Gabriela D. Flowers, and Sochie L. Graham, for Petitioner.

Dannis, Wolliver, Kelley, Sue Ann Salmon Evans and Ellen C. Wu; Keith J. Bray Kristin D. Lindgren, and Dana Scott for Education Legal Alliance of the California School Boards Association as Amicus Curiae on behalf of Petitioner.

J. Felix De La Torre, Wendi L. Ross, Jeremy G. Zeitlin, Seth P. Williams, and Gabriel H. Orea for Respondent.

Andrew J. Kahn and Alex S. Leenson for Real Party in Interest.

-ooOoo-

California School Employees Association (CSEA) filed an unfair practice charge with the Public Employment Relations Board (Board or PERB).[1] The filing alleged Visalia Unified School District (VUSD) violated Government Code[2] section 3543.5, subdivision (a), by firing an employee—a secretary and local union chapter president—"in retaliation for engaging in protected union activity."

The Board, which has exclusive jurisdiction to adjudicate antiunion allegations brought by public employees against public employers, subsequently filed a formal complaint against VUSD. (See § 3541.5.) The formal complaint charged VUSD with violating section 3543 by terminating the employee for engaging in protected activity: serving as a union officer and advocating on the union's behalf.[3]

Before the Board, VUSD argued (1) the employee failed to raise retaliation prior to termination, (2) service in a union was not protected activity, (3) CSEA failed to prove retaliation, and, in any event, (4) VUSD would have terminated the employee for inadequate performance. The Board found in the employee's favor, concluding status as a union officer is activity protected under the Educational Employment Relations Act (EERA), VUSD retaliated against the employee for her union activity, and VUSD failed to prove it would have terminated the employee notwithstanding an antiunion motive.

On review, VUSD renews its arguments. Both CSEA and PERB resist, urging this court to deny VUSD any relief from the Board's decision.

We conclude the Board correctly interpreted the law, properly found an inference VUSD retaliated against the employee for her union activity, but erred in holding VUSD failed to prove its affirmative defense it would have terminated the employee for poor

---

[1] We use Board to refer to both the venue and decision below. We use PERB to refer to the party appearing on review.

[2] Undesignated statutory references are to the Government Code.

[3] It also alleged a derivative charge under section 3543.5, subdivision (b).

performance notwithstanding any protected activity.  Accordingly, VUSD is entitled to relief.

## BACKGROUND

Ramirez[4] was employed by VUSD for more than 20 years.  She served as the local union chapter vice president and president between 2016 and 2018.

In 2015, VUSD initiated termination proceedings against Ramirez.  The parties settled the dispute the next year, and Ramirez agreed to transfer into a position with Visalia Charter Independent Study (VCIS).

VCIS and Attendance

VCIS "operates traditional and online independent study programs" and "is a dependent charter school, meaning it is part of" VUSD.  VCIS's funding is tied to student attendance which in turn depends on students completing work.

When students complete work, teachers credit students with full attendance on an "assignment sheet."  Because "accuracy is important," "school policy" requires a "buddy" to double-check attendance.  After attendance on an assignment sheet was double-checked , Ramirez would enter *nonattendance* into a computer program—the program defaults to full attendance, so it was unnecessary to enter actual attendance.  The program entries "equate[] to funding for the school."

Attendance Errors

If a student fails to complete enough assignments, VCIS can drop the student.[5]  In either December 2017 or January 2018, a parent complained a student was erroneously assessed an absence.  The VCIS principal investigated the complaint, learned the parent was correct, and, when other attendance discrepancies were noticed, initiated a larger

---

[4] For privacy, we omit the employee's full name.

[5] When students fail to complete work and are marked absent, a warning, called a "contract violation," is provided.  "Students are allowed [three] contract violations in one school year," at which point a student is subject to removal.

investigation. All told, Ramirez incorrectly entered attendance more than 100 times between September 2016 and January 2018, i.e., the entire period she was assigned to perform the task.[6]

The principal's findings were reported to the superintendent.[7] Ramirez was placed on leave on January 22, 2018, pending further investigation.

January 9, 2018 School Board Meeting

Two weeks prior to Ramirez's placement on leave, she attended a school board meeting and criticized district policy—and the superintendent—requiring certain employees to appear on school property to write "book reports …." At least two school board members expressed empathy with the concern. The superintendent was present.

Termination Proceedings

The superintendent investigated "deeper" into Ramirez's errors. This investigation concluded Ramirez "falsif[ied] school district records," "created numerous transcript and system errors …, creating incorrect and false permanent academic records for students," failed to implement policy on double-checking attendance, and misadvised "students and parents …." The investigation placed VCIS's potential liability for misreporting attendance to the state at nearly $750,000.

VUSD subsequently initiated termination charges against Ramirez. The charges were based on "[f]alsifying information," "[i]ncompetency," "[i]nefficiency," "[n]eglect of duty," "[i]nsubordination," "[d]iscourteous [t]reatment of the [p]ublic," and violating "rules, policies[,] or procedures …."

---

[6] Ramirez's attendance errors went both ways: approximately 100 times she mistakenly reported students were present, and approximately one dozen times she mistakenly reported they were absent.

[7] At the time, the superintendent was an assistant superintendent. By the time she testified before the Board, she was the superintendent. For simplicity, we refer to her as the superintendent.

Ramirez contested the charges at a hearing provided by VUSD. (See, generally, Ed. Code, § 45113.) The principal testified to VUSD's concerns with Ramirez, including Ramirez's "attitude towards students and staff members," botching "orientations" with families by providing incorrect directions, "some issues with transcript errors," misreporting attendance due to not properly identifying graduated students, and misreporting attendance in general.[8]

The principal also discussed Ramirez's recent unsatisfactory performance evaluations and recent reprimand letters. For example, the expressed concerns involved "procedures … not being followed," not taking "initiative[]," "negligen[ce]," "careless[ness],"and "things not being done …."

The superintendent testified Ramirez previously settled termination charges by agreeing to transfer into another position with VUSD. She added that Ramirez's performance history factored into the decision to terminate because the current concerns "all occurred in [the] previous position," representing "a long standing pattern for at least six years …." Finally, she deduced Ramirez intentionally falsified attendance records because "it's such an easy task that [it must be] falsification" "on purpose …."

In rebuttal, a parent testified Ramirez was courteous, friendly, and professional. Ramirez herself testified, denouncing all allegations and generally claiming VUSD failed to provide adequate training. Positive materials, including documented praise and prior, satisfactory performance evaluations, were introduced on her behalf. She acknowledged failing to implement a prior directive "to have others check [her] work for accuracy," but explained there was "no one there to check [her] work."

The hearing officer found the following facts true. Between 1997 and 2012, Ramirez "received evaluations" indicating her work exceeded or met expectations "in

---

[8] All testimony at the VUSD hearing was admitted into evidence at the formal hearing before the Board.

almost all instances."  Evaluations in 2013, 2014, and 2015 demonstrated Ramirez's need to improve in work quality and analytical problem solving.  Also in 2015, Ramirez received multiple reprimand letters due to "errors in … 'work output,' " and "concerns with … job performance."

The hearing officer concluded all charges, except for falsifying records, were substantiated.  About one week later, the VUSD school board voted to terminate Ramirez's employment.

Proceedings Before the Board

As noted, the Board subsequently issued a complaint against VUSD based on CSEA's allegations.  VUSD answered the complaint raising numerous defenses, generally based on fact but also claiming the charges were barred by "res judicata" and "collateral estoppel."

The matter proceeded to a formal hearing presided over by an administrative law judge.  The same parties testified to the same general facts.  Ramirez testified she settled her complaint against VUSD by agreeing to transfer positions, withdrawing her complaint, VUSD withdrawing its termination charges,[9] and VUSD withdrawing a specific reprimand letter.[10]  She acknowledged her responsibilities included scheduling orientations for students and families and "enter[ing] grades and attendance …."

Ramirez conceded that, early on in her new assignment at VCIS, she made errors in attendance by using an incorrect code.  These errors were readily corrected by another employee.  Ramirez believed the attendance-training she received was insufficient.

---

[9] The Board stated VUSD issued termination charges "subsequent[]" to Ramirez's complaint, but Ramirez herself testified VUSD filed termination charges first, and "then [she] filed a complaint against" VUSD.  The settlement agreement suggests VUSD "brought dismissal charges" before Ramirez "filed a complaint …."  The exact sequence is ambiguous but immaterial to this opinion.

[10] In our analysis, we consider the withdrawn letter, dated July 22, 2015, to the extent it was properly considered by the VUSD hearing officer.

6.

In January 2017, Ramirez became the union vice president, despite the principal urging her to "not accept the nomination" due to lacking coverage for Ramirez's "building." The following year, Ramirez publicly criticized the superintendent at a school board meeting. Two weeks later she was placed on paid leave pending an investigation, which explicitly prevented her from attending union meetings and conversing with union members. These latter restrictions were eventually lifted.[11]

Ultimately, Ramirez denied falsifying any records, denied receiving extra support indicative of poor performance, and provided several examples wherein she asked questions, paid attention to detail, followed through on directives, and refuted performance criticisms.[12]

Another VCIS employee, tasked with assisting the principal to conduct the initial investigation into attendance errors, testified VCIS "could get [its] doors closed if [it] inaccurately report[ed] … attendance." She added, as "compliance coordinator," she was aware a school can potentially lose a student's funding for the entire year by misreporting a single day's attendance.

VUSD's "chief business officer" testified school funding is tied to "average daily attendance …." He acknowledged VCIS was able to correct Ramirez's errors relating to that current school year, but not the prior school year. He did not contact the California Department of Education nor was he aware of any actual financial hardship or impact stemming from Ramirez's errors.

---

[11] Technically, VUSD eventually allowed Ramirez "to attend CSEA meetings while she [was] on paid administrative leave" but did not permit her to "go to her school site" or "discuss her work as it pertain[ed] to VCIS." Whether the restriction on discussing her work meant she could not discuss the pending investigation, or if that was what Ramirez understood it to mean, is unclear.

[12] Refutation occurred both through testimony and contemporaneous rebuttal letters responsive to challenged performance evaluations.

VCIS's principal testified Ramirez's first opportunity to enter attendance was September 2016. Ramirez was timely trained to enter attendance. By December, the principal was concerned with Ramirez's disorganization, failure to order supplies "in a timely manner," discourteous treatment to guests, and creating "scheduling conflicts" with orientations. These concerns were documented in January 2017, including additional concerns about transcripts and attendance.

In December 2017, a mother contacted the principal complaining of attendance discrepancies for her child. The principal verified the mother's complaint was correct and began identifying "other issues with … attendance," uncovering "quite a few discrepancies …." She became concerned about "severe penalties to [the] school" and contacted the superintendent.

The superintendent ordered the principal to "dive" "deeper" into attendance. The deeper investigation "discovered" "additional errors" relating to "paperwork" and "transcript[s.]" After completing the investigation, the principal presented a report to the superintendent, who then "conducted [an even] deeper investigation."

The superintendent's investigation concluded Ramirez's errors resulted in a near $750,000 *potential* financial impact. The superintendent believed misreporting attendance was "very serious," notwithstanding no ultimate "financial impact," and decided to recommend termination.

The decision to terminate was based on Ramirez's "long-standing pattern" of errors "that had been going on for years" with "continual verbal warnings" without "improvement …." Misreporting attendance, prior "inaccuracies," "not paying attention to detail," previous reprimand letters, and unsatisfactory performance evaluations all factored into the decision to terminate.

The superintendent believed progressive discipline was followed in this matter, including "verbal warnings," "conferences" with "managers," reprimand letters, informal conversations, and previously seeking termination. She added this incident marked

VUSD's first full-scale attendance audit, VUSD had never "terminated an employee for unintentionally misreporting attendance," and falsification meant "inaccurate ...."[13]

An "assistant superintendent" testified she previously investigated Ramirez for "[l]ack of attention to detail," and "grave mistakes," i.e., "errors in reporting" agenda items to the VUSD school board. She recommended "dismissal charges" because Ramirez "had … many different opportunities" to correct her work output, including "meetings, several letters of reprimand, training, … [and] many, many discussions going over what needed to be done and the process in which it needed to be done." She supported termination because Ramirez's "careless errors[] continued to be made … without correction …."

*Board Exhibits*

The parties introduced several exhibits including a transcript from the prior hearing, negative and positive performance evaluations, Ramirez's rebuttals to certain evaluations, all reprimand letters, the settlement agreement, the final attendance report, and examples of Ramirez taking initiative, asking questions, and garnering praise. The evaluations and reprimands generally focused on performance.

*Evaluations*

Ramirez received overwhelmingly positive evaluations in 1997, 1998, 2000, 2003, 2005, 2006, 2008, 2010, and 2012.[14] In 2013, Ramirez's evaluations turned negative. The 2013 evaluation noted she needed to "increase her attention to details and the quality of the work she produces." It also noted problems with "[a]nalytical and [p]roblem-[s]olving [s]kills[.]" The 2014 evaluation noted the same.

---

[13] The Board found the superintendent's falsification definition less than credible.

[14] The record does not contain an evaluation for the years not mentioned. The reason for the omission is unclear.

9.

In 2015, Ramirez's evaluation stated she made "errors … negatively impact[ing] the department."  It also described problems with analysis and problem solving.

The evaluation turned worse in 2017.  This evaluation "marked" Ramirez as needing improvement in dependability, professionalism, public relations, efficiency, adherence to policy, initiative, skill, knowledge, and work quality.  Specifically, it described her "struggl[ing] to meet the requirements of her job description" despite numerous resources available for assistance.

*Reprimands*

In 2015, Ramirez received four reprimands in succession.  The first, titled "Errors in Work Output," described an error in placing the wrong item on an agenda for a school board vote.  The letter mentioned the fact her "evaluations for the past two years" advised a "need to slow down with … work and focus … on the details."

The next reprimand, titled "Job Performance," noted "multiple errors and misunderstandings" relating to new hires.[15]  The third reprimand, also titled "Job Performance," described an error in not following directions about contacting an employee.[16]  The fourth—and last—reprimand soon followed but was subsequently withdrawn in settlement.

Board's Decision

The Board's decision proceeded in two parts.  First, it found the facts.  Second, it analyzed the law.

*Board's Facts*

The Board found "Ramirez received overwhelmingly positive performance evaluations" between 1997 and 2012.  In 2013, the evaluation rated Ramirez's work

---

[15] The letter in the record is vague and does not describe a specific error, or even what task was required.

[16] Ramirez filed a rebuttal to each reprimand.

10.

quality and problem-solving skills as unsatisfactory. The following two years' evaluations were substantially similar. In 2017, the evaluation was "generally unfavorable …."

VUSD "issued four letters of reprimand to Ramirez regarding her job performance" in 2015. Ramirez, for her part, "filed a written complaint … alleg[ing] that her supervisor had discriminated against her and created a hostile work environment." VUSD, at some point,[17] initiated termination charges, but the parties formally settled their differences with Ramirez accepting a new position within the district.

The settlement agreement sealed both "the contents of the termination charges" and the fourth reprimand letter. It permitted review by "[o]rder of [a]n [a]dministrative [h]earing [o]fficer" and did not prohibit VUSD from disciplining Ramirez for subsequent misconduct.

Ramirez's new "job duties included serving as a receptionist, registering and holding orientations for new students, maintaining student files, receiving and storing supplies, and [electronically] entering grades and student attendance …." "One of [her] main responsibilities was entering attendance …."

Accurate attendance reporting is important to VCIS because the school's public funding is tied to … average daily attendance …." During the relevant time period, Ramirez committed 110 attendance errors. VUSD's "auditors" did not believe the errors were material, and VUSD "was not ultimately penalized for any of the reporting errors …."

When, in late 2016, Ramirez was nominated to serve as a union officer, the principal expressed concern about the impact union activity would have on Ramirez's

---

[17] The record is unclear as to the exact sequence. Ramirez testified VUSD "had filed charges … to terminate" her and "then [she] filed a complaint against" VUSD.

work performance.  Ramirez began serving as vice president in January 2017.[18]  One year later, she criticized the superintendent at a public school board meeting.  Two weeks later, she was placed on leave pending an investigation.  VUSD "more likely than not decided to investigate Ramirez after she spoke out at the [school board] meeting."

The reason for the investigation was not initially revealed to Ramirez, and the accompanying leave notice prohibited her from entering VUSD property and contacting staff or students about the investigation.  About two months later, the superintendent permitted Ramirez to attend union meetings.

After a hearing[19] provided by VUSD, the hearing officer sustained all allegations except for falsifying records.  The officer recommended termination, and the VUSD school board ultimately voted to terminate "Ramirez from employment."

*Board's Analysis*

The Board inferred VUSD retaliated against Ramirez for her protected union activity.  It also found VUSD failed to prove it would have terminated Ramirez irrespective of her engaging in protected activity.

First, the Board concluded "Ramirez engaged in protected activities by serving as Chapter Vice President and Chapter President, as well as by speaking at the [VUSD school board] meeting" where she criticized the superintendent.  This conclusion "overrule[d]" prior Board precedent requiring " 'something more' than holding union office to show … protected activity …."

Second, the Board found VUSD retaliated against Ramirez for engaging in protected union activity.  This finding was based on both the timing between Ramirez criticizing the superintendent at the school board meeting, and, alternatively, assessing numerous factors, including "timing," "disparate treatment," "departure from established

---

[18] Ramirez began serving as chapter president in January 2018.

[19] See Education Code section 45113.

12.

procedures," "inadequate investigation," disproportionate punishment, "fail[ing] to offer a contemporaneous justification, or offering exaggerated … reason[ing]," "animosity towards union[s]," and "any other" relevant facts "that might demonstrate [an] unlawful motive."

Last, the Board held VUSD failed to establish "it would have terminated Ramirez regardless of her protected activity because of her ongoing performance issues." The Board recognized "concern with the impact of Ramirez's errors on students [was] a legitimate one," but believed that was pretextual. The Board's conclusion was three-pronged.

One, VUSD "refer[red] to students in the plural, [but] provided only a single example," failed to "cite any other ways in which students were negatively impacted," and the lone example "did not ultimately have a negative impact on the particular student because the mistake was corrected." Two, Ramirez's past performance issues, noted through her evaluation in 2017, did not warrant discipline at those times, "and the record [was] inadequate to show the extent to which [she] continued or corrected [her] performance issues …"[20]

Finally, Ramirez's errors in recording attendance "would likely have [justified] a lower level of discipline," "[b]ut … the evidence simply [did] not show [VUSD] would have chosen termination as its discipline[e] … absent [the] protected activity." The Board ultimately ordered VUSD to rescind Ramirez's termination and reinstate her to her position or its equivalent.

## DISCUSSION

VUSD presents four primary questions for review. Was Ramirez precluded from pursuing her retaliation claim with the Board? Is holding union office activity protected

---

[20] Technically, there are four prongs to the Board's analysis, but it claimed the third "simply reiterated" the second, and rejected it "for the same reasons," i.e., past performance issues did not then warrant discipline.

by the EERA?  Did the facts establish retaliation? Did VUSD prove its affirmative defense it would have terminated Ramirez notwithstanding her union activity?

PERB and CSEA believe this court should deny the petition, essentially affirming the Board's decision.  We conclude Ramirez was not precluded from seeking redress from the Board, holding union office is activity protected by the EERA, the facts did support retaliation; however, VUSD proved its affirmative defense.  VUSD is entitled to appropriate relief.

## I.  The Board Has Exclusive Jurisdiction to Adjudicate Antiunion Action

Preliminarily, VUSD contends the Board's "conclusion rests upon defenses never raised in Ramirez's [administrative] termination hearing," barring their "consideration by [the Board] under res judicata or estoppel."  VUSD also contends Ramirez failed to utilize Code of Civil Procedure section 1094.5 to set aside her termination, which is "the singular mechanism to 'appeal' [her] termination."  We reject these contentions.[21]

"Where … the decision [at issue] is alleged to be a violation of the [EERA], the remedy lies with [the Board]."  (*Sunnyvale Unified School Dist. v. Jacobs* (2009) 171 Cal.App.4th 168, 173 (*Sunnyvale*); § 3541.5 ["The initial determination as to whether the charges of unfair practices are justified, and, if so, what remedy is necessary to effectuate the purposes of this chapter, shall be a matter within the exclusive jurisdiction of the board."]; see *City of San Jose v. Operating Engineers Local Union No. 3* (2010) 49 Cal.4th 597, 603-606.)  Accordingly, Ramirez was essentially restricted from presenting her retaliation claim to any body other than the Board.

Res judicata, or claim preclusion, is simply not implicated because in this case the Board provided the *first* opportunity for CSEA and Ramirez to present a retaliation

---

[21] The Board apparently did not resolve these issues.

claim.[22] (*Samara v. Matar* (2018) 5 Cal.5th 322, 326 [res judicata, also known as " 'claim preclusion,' " "prevents relitigation of entire causes of action."].) Similarly, because the EERA provides a lawful remedy, Ramirez was not required to invoke Code of Civil Procedure section 1094.5. (See *Conn v. Western Placer Unified School Dist.* (2010) 186 Cal.App.4th 1163, 1174 [available remedy under Education Code obviated need to seek administrative writ].)

In arguing otherwise, VUSD cites *Takahashi v. Board of Education* (1988) 202 Cal.App.3d 1464, 1481 (*Takahashi*). There, the appellate court stated "[i]t has long been the law in California that any available defense should be asserted at the earliest opportunity and certainly at an administrative hearing." (*Id.* at p. 1481.) True.

*Takahashi,* however, involved claims the individual "could have … litigated" at the same time as other claims actually raised. (*Takahashi, supra,* 202 Cal.App.3d at pp. 1471, 1474-1475, 1481-1485 [racial, gender, and age discrimination, including due process violations].) This case is different. CSEA and Ramirez could not *earlier* present a defense within the *later* exclusive jurisdiction of the Board. (§ 3541.5.) Claim preclusion and estoppel are inapplicable.[23]

---

[22] It is true, of course, Ramirez could have raised antiunion retaliation at any time prior to reaching the Board. But, because it is only the Board's decision that matters, she was not required to do so.

[23] Notably, in the proceedings below, VUSD argued "the [retaliation] claim [was] covered by" a collective bargaining agreement, "culminat[ing] in binding arbitration" to which the Board should have "deferred" the claim. It does not appear the Board ever addressed arbitration.

Public school employers and employees are entitled to collectively bargain and agree to arbitrate claims. (§ 3543.2.) The parties in this case had an agreement to arbitrate defined "grievance[s] …." The law, however, prohibits collectively bargaining the "causes and procedures" related to "dismissal …." (*Ibid.*) Assuming retaliation is a grievance, because this is a case involving dismissal, it "is not subject to contractual arbitration." (*Sunnyvale, supra,* 171 Cal.App.4th at p. 173.)

Finally, VUSD asserts the Education Code hearing conclusively established sufficient cause to terminate Ramirez. Education Code section 45113, subdivision (b) provides that "the governing board's determination of the sufficiency of the cause for disciplinary action shall be conclusive." (See *Board of Education v. Round Valley Teachers Ass'n* (1996) 13 Cal.4th 269, 287 ["school board's determination of sufficiency of cause for disciplinary action" is conclusive via statute].)

There is no decisional law discussing the intersection between Education Code section 45113 and the EERA. Education Code section 45113 vests in school boards the power to determine cause. PERB is entitled to review facts and resolve disputes to determine whether retaliation has occurred, but when Education Code section 45113 applies, it cannot override a finding sufficient cause for discipline existed.

In other words, PERB must start with one fact already proved: sufficient cause existed for the discipline at issue. (See *United Steelworkers of America v. Board of Education* (1984) 162 Cal.App.3d 823, 839 [ the word "conclusive" in Education Code section 45113, subdivision (b) is broader than "a limitation on judicial review."]; cf. *State of California (Department of Social Services)* (2019) PERB Dec. No. 2624-S, p. 9 [43 PERC ¶ 128] (*Social Services*) [recognizing that in some instances, estoppel may apply in PERB proceedings].) PERB may still find retaliation, but it cannot negate cause.[24] With this understanding, we turn to the merits.

## II. Holding Union Office is Itself Activity Protected by the EERA

The Board held Ramirez's union-officer status—distinct from publicly criticizing the superintendent—constituted protected activity. VUSD decries the holding, believing it is both inconsistent with Board precedent and the EERA's plain language. We disagree.

---

[24] The fact sufficient cause existed for discipline does not mean there was no unlawful retaliation. Other circumstances may prove a retaliatory motive notwithstanding sufficient cause for discipline.

### A. Additional Background

The Board in this matter specifically held Ramirez's "status as a union officer from January 2017 until her termination in April 2019" constituted activity protected by the EERA. In so holding, the Board "overrule[d] [*Trustees of the California State University* (2009) PERB Dec. No. 2038-H [33 PERC ¶ 106] (*Trustees*)] and similar decisions to the extent they h[e]ld that an employee must allege 'something more' than holding union office to show that he or she has engaged in protected activity under any PERB-administered statute."

The holding was based on interpreting the Meyers-Milias-Brown Act (MMBA) (§ 3500 et seq.). Section 3502.1—part of the MMBA—states "[n]o public employee shall be subject to punitive action or denied promotion, or threatened with any such treatment, for the exercise of lawful action as an elected, appointed, or recognized representative of any employee bargaining unit." The Board recognized this statute "is unique to the MMBA …." In other words, the other Board-administered acts[25] do not carve out specific protections for union officers.

Nonetheless, the Board, seeking harmony in all acts it administrates, found persuasive the fact the Legislature " 'did not create a new or separate category of unfair practice' " when it enacted section 3502.1 Rather, the Legislature's enactment "merely clarified the protections which 'were *already* afforded to employee bargaining unit representatives' " under the MMBA. That analysis was based on the Board's prior decision in *Santa Clara Valley Water Dist.* (2013) PERB Dec. No. 2349-M [38 PERC ¶ 96] (*Santa Clara*).

---

[25] See, e.g., MMBA (§ 3500 et seq.), Dills Act (§ 3512 et seq.), Judicial Council Employer-Employee Relations Act (§ 3524.50 et seq.), EERA (§ 3540 et seq.), Higher Education Employer-Employee Relations Act (§ 3560 et seq.), Trial Court Employment Protection and Governance Act (§ 71600 et seq.), and Trial Court Interpreter Employment and Labor Relations Act (§ 71800 et seq.).

**B. Analysis**

The EERA grants "[p]ublic school employees … the right to form, join, and participate in the activities of employee organizations of their own choosing for the purpose of representation on all matters of employer-employee relations."  (§ 3543.)  It prohibits "public school employer[s]" from "[i]mposing or threaten[ing] to impose reprisals on employees, to discriminate or threaten to discriminate against employees, or otherwise to interfere with, restrain, or coerce employees because of their exercise of rights guaranteed by" the EERA.  (§ 3543.5, subd. (a).)

The EERA "is considerably broader than … the National Labor Relations Act …." (*Redwoods Community College Dist. v. Public Employment Relations Bd.* (1984) 159 Cal.App.3d 617, 623.)  Nonetheless, when interpreting the EERA, "it is proper to look to [the National Labor Relations Act] for its persuasive value."  (*County of San Joaquin v. Public Employment Relations Bd.* (2022) 82 Cal.App.5th 1053, 1069 (*San Joaquin*); cf. *County of Los Angeles v. Los Angeles County Employee Relations Com.* (2013) 56 Cal.4th 905, 916 [the Public Employment Relations Board "is a quasi-judicial administrative agency modeled after the [National Labor Relations Board."].)

The United States Supreme Court has held "[h]olding union office clearly falls within the activities protected" by the National Labor Relations Act.  (*Metropolitan Edison Co. v. N.L.R.B.* (1983) 460 U.S. 693, 703.)  For the following reasons, we reach the same conclusion under the EERA.

### i. Statutory Interpretation

Foremost, we have no doubt the EERA's plain language protects holding union office.  Holding office undoubtedly exercises the right to join and participate in a union. (§ 3543 ["[p]ublic school employees [have] … the right to form, join, and participate in" unions]; *Riverside County Sheriff's Dept. v. Stiglitz* (2014) 60 Cal.4th 624, 630 [" ' "When interpreting statutes, we begin with the plain, commonsense meaning of the

18.

language used by the Legislature.  [Citation.]  If the language is unambiguous, the plain meaning controls." ' "].)

VUSD, arguing otherwise, focuses on the fact the EERA protects a public employee's "*exercise*" of rights.[26]  The argument is somewhat inexplicable.  Seeking, joining, and holding union office *is an exercise of rights*.  (See *Knox v. Service Employees Intern. Union, Local 1000* (2012) 567 U.S. 298, 309 ["the ability of like-minded individuals to associate for the purpose of expressing commonly held views may not be curtailed."]; *Christian Legal Soc. Chapter of the University of California, Hastings College of the Law v. Martinez* (2010) 561 U.S. 661, 680 [" 'Freedom of association' … 'plainly presupposes a freedom not to associate.' "]; *Cumero v. Public Employment Relations Bd.* (1989) 49 Cal.3d 575, 601 ["the EERA guarantees each employee in the unit the free choice of joining the union, refraining from participation in any union, or joining a rival union"].)

### ii.  Board Precedent

VUSD argues the Board's precedent establishes " 'simple maintenance of [an employee's union] position … is insufficient" to invoke the law's protection.  (See *Chula Vista Elementary School Dist.* (1997) PERB Dec. No. 1232-Ea, p. 4 [22 PERC ¶ 29057] (*Chula Vista*).)  We disagree.

In *Chula Vista,* the Board held simply holding membership in the union was "insufficient to satisfy the timing element of the [circumstantial evidence] test," i.e.,

---

[26] Amicus joins in this argument, citing *Service Employees International Union, Local 99 (Kimmett)* (1979) PERB Dec. No. 106-E [3 PERC ¶ 10134].  There, the Board held it did not have authority to govern a union's "internal activities" and force it to "operate[] in any particular way," "unless" there exists "a substantial impact on employees' relationship with their employer …."  (*Id.* at pp. 13-17.)  The decision is simply inapposite to defining exercise.

membership itself is not circumstantial evidence of retaliation.[27] (*Chula Vista, supra,* PERB Dec. No. 1232-Ea at p. 4.) Following *Chula Vista,* the Board in *Trustees* held an employee's "serv[ice] as a union steward" did not constitute protected activity. (*Trustees, supra,* PERB Dec. No. 2038-H at pp. 10-11.) That holding is based on *Chula Vista* but misapplies the decision. *Chula Vista* does not stand for the proposition holding union office is not protected activity. (See *Chula Vista, supra,* PERB Dec. No. 1232-Ea at p. 4 ["maintaining [union] membership[] is insufficient to satisfy the timing element of the [circumstantial evidence] test."].)

Viewed properly, the Board's precedent does not proscribe officer status in a union from establishing protected activity. Indeed, *Santa Clara* explicitly held serving as a union officer was activity protected by law. (*Santa Clara, supra,* PERB Dec. No. 2349-M at p. 29.) VUSD distinguishes *Santa Clara* because it involved the MMBA. It is true, as VUSD points out, section 3502.1 is unique to the MMBA in that it specifically protects union office. (See *ante,* **II., A.**) The EERA, on the other hand, explicitly protects only the rights to "form, join, and participate" in unions. (§ 3543.) The plain language difference is, in our view, immaterial. VUSD, on the other hand, argues unique protections afforded to union officers in the MMBA are superfluous if not given effect. (See *Brennon B. v. Superior Court* (2022) 13 Cal.5th 662, 691 [courts "seek to avoid 'interpretations that render any language surplusage.' "].) We disagree.

As the Board explained in *Santa Clara*, the Legislature made clear section 3502.1—enacted by Assembly Bill No. 1184 (2021-2022 Reg. Sess.)—served only "to clarify and reinforce the existing rights of public employees under the MMBA …." (*Santa Clara, supra,* PERB Dec. No. 2349-M at p. 20.) "[T]he Legislature did not," in other words, "intend to create a new or separate category of unfair

---

[27] In Board parlance, the circumstantial evidence test is often called the *Novato* test. (See *Novato Unified School Dist.* (1982) PERB Dec. No. 210-E, pp. 6-7 [6 PERC ¶ 13114] [describing "factors … support[ing] [an] inference of unlawful motive"].)

practice."[28] (*Id.* at p. 21; Assem. Bill No. 1184 (2001-2002 Reg. Sess.) § 2 ["The Legislature finds and declares that the provisions of this act are declaratory of existing law."].)

"[A] declaration by the Legislature that a statut[e] … is declaratory of existing law is … a factor entitled to due consideration" when interpreting a statute, and one we find persuasive in this case. (*Lone Star Security & Video, Inc. v. Bureau of Security & Investigative Services* (2009) 176 Cal.App.4th 1249, 1256.) Interpreting section 3502.1 as declaratory best fits "the whole system of law of which it is a part, so that all may be harmonized and anomalies avoided." (*Coachella Valley Mosquito & Vector Control Dist. v. Cal. Public Employment Relations Bd.* (2005) 35 Cal.4th 1072, 1089 (*Coachella*).) Accordingly, section 3543 in the EERA likewise protects serving as a union officer.[29] (*Coachella* at p. 1090 [statutory interpretation must avoid "inexplicable anomaly"]; cf. *Skidgel v. Cal. Unemployment Ins. Appeals Bd.* (2021) 12 Cal.5th 1, 21 [" 'the canon against surplusage is [merely] a guide to statutory interpretation and is not invariably controlling.' "].)

### iii. Conclusion

VUSD resists interpreting the EERA to protect service as a union officer. In so doing, "it points to the absurd results that may reasonably follow from" such an interpretation. Those results primarily concern nullifying "the litany of [Board] decisions articulating the contours of what is and is not protected activity," axiomatically proving

---

[28] Also in *Santa Clara, supra,* the Board acknowledged, section 3502.1 notwithstanding, section 3502's protection of the "right[s] to join, form, and participate" in unions would still protect s union officer's service. (*Santa Clara, supra,* PERB Dec. No. 2349-M at p. 28.)

[29] Notably, section 3502.1 was enacted in 2001. The EERA was enacted in 1975. (*Coachella, supra,* 35 Cal.4th at p. 1084.) Section 3502.1's later enactment, as a declaratory statute, explains why similar, officer-centric language absent from the EERA or other PERB-administered statutes is, really, an explicable anomaly.

21.

"temporal proximity between the protected activity and the adverse action," and incentivizing "unsatisfactory" employees to seek union office.[30]  We address each concern in turn.

### a.  Board Precedent Describing Protected Activity

Because employees relying on officer status alone will often find it difficult to prove retaliation, the "litany of PERB decisions articulating the contours of what is and is not protected activity" becomes *more* important.  Those cases generally describe specific acts constituting protected activity, which, in practice, make it simpler to prove retaliation, especially where adverse action quickly follows an exercise of rights.  (E.g., *Monterey Peninsula Unified School Dist.* (2017) PERB Dec. No. 2530-E, p. 9 [42 PERC ¶ 2] [criticizing management "during staff meetings"]; *Walnut Valley Unified School Dist.* (2016) PERB Dec. No. 2495-E, pp. 9-10 [same]; *Petaluma City Elementary School Dist./Joint Union High School Dist.* (2016) PERB Dec. No. 2485-E, pp. 43-46 [41 PERC ¶ 23] [picketing, leaflets, and soliciting support]; *San Mateo County Community College Dist.* (2008) PERB Dec. No. 1980-E, p. 8 [32 PERC ¶ 153] [utilizing union representation "in a work-related dispute"]; *East Whittier School Dist.* (2004) PERB Dec. No. 1727-E, p. 9 [29 PERC ¶ 40] [wearing union buttons]; *Wilmar Union Elementary School Dist.* (2000)  PERB Dec. No. 1371-E, p. 16 [24 PERC ¶ 31053] [campaign sign on "private vehicle" in parking lot]; *Ventura County Community College Dist.* (1999) PERB Dec. No. 1323-E, p. 10 [23 PERC ¶ 30094] [filing a grievance]; *Healdsburg Union High School Dist.* (1997) PERB Dec. No. 1185-E, p. 47 [21 PERC ¶ 28055] [filing grievances, representing others, and serving as negotiator]; *Coachella Valley Unified*

---

[30] VUSD also warns of "open[ing] the door" to protecting "mere union *membership*[.]"  Neither PERB nor CSEA advocate that position, and we need not address it because it is not ripe for decision—this case does not involve "mere" membership.  (But see *Santa Clara County Counsel Attys. Assn. v. Woodside* (1994) 7 Cal.4th 525, 555 ["Public employers may not discriminate against their employees on the basis of membership or participation in union activities."].)

*School Dist.* (2013) PERB Dec. No. 2342-E, p. 12 [38 PERC ¶ 95] ["reporting cheating [on standardized tests] by teachers is not protected"].)

The Board cases describing what is and what is not protected activity will endure and serve a vital role in evaluating union-retaliation complaints. Evisceration of these decisions by protecting status as a union officer is an unwarranted concern.

### b. Temporal Proximity

Temporal proximity is important to demonstrating a rational connection between protected activity and adverse action. (*Mt. San Jacinto Community College Dist.*, PERB Dec No. 2865-E, p. 27 [48 PERC ¶ 15].) VUSD argues status as a union officer itself constituting protected activity would necessarily provide temporal proximity in each and every case. Typically, timing alone does not establish a retaliatory motive, but the closer in time an adverse action is to protected activity, the stronger the retaliatory inference. (*Id.* at pp. 27-28.)

VUSD's concern about union service and temporal proximity is adequately addressed by identifying the appropriate endpoints. For example, it is possible for an employee to hold a union office for years. Given that potential lengthy period, the longer an employee holds office without experiencing adverse action, the less likely it is that any adverse action was due to the employee's union status. Accordingly, properly assessing temporal proximity based on officer status *alone* requires considering the time period between the employee assuming office and experiencing an adverse action.

Absent temporal proximity, litigants will generally encounter difficulty in proving retaliation. (See *City of Santa Monica* (2020) PERB Dec. No. 2635-Ma, p. 46 [44 PERC ¶ 125] (*Santa Monica*) ["if the timing evidence is weak then a charging party will normally need to marshal a stronger array of other, non-timing evidence."].) Because every case depends on its own facts, however, we cannot now broadly discern a potential, speculative impact.

In any event, the Board's decisions make clear temporal proximity alone is insufficient to establish retaliation. (E.g., *Trustees, supra,* PERB Dec. No. 2038-H at p. 16 ["Although … temporal proximity … is an important factor," it is not itself sufficient]; *Santa Monica, supra,* PERB Dec. No. 2635-Ma at pp. 45-46 [timing "inference weakens as the gap in time grows;" "timing alone is typically not determinative"]; *City of San Diego* (2020) PERB Dec. No. 2747-M, p. 26 [45 PERC ¶ 45] ["protected activity" must be "substantial or motivating cause of the adverse action"].) There is no reason to fear the Board will depart from its well-established, well-grounded precedent.

### c. Incentivizing Union Activity

Finally, VUSD argues protecting union officers "creates the perverse incentive for certain union members to seek office," i.e., those "whose work performance is unsatisfactory …." We have already addressed the continuing viability and importance of engaging in protected activity beyond joining or serving in a union. Serving as a union officer, however, warrants particular protection because officers act as the union's face and risk disproportionate backlash and criticism. (*Local Union 1392, Intern. Broth. of Elec. Workers, AFL-CIO v. N.L.R.B.* (6th Cir. 1986) 786 F.2d 733, 736 ["Obviously, unions act only through their officers."]; *Coats v. Construction & Gen. Laborers Local No. 185* (1971) 15 Cal.App.3d 908, 913, fn. 1 ["A union is an institution comparable to a corporation and acts normally through elected officers."]; *General Motors Corp.* (1975) 218 N.L.R.B. 472, 477 [officers are the union in an employer's eyes].)

To the extent VUSD is concerned deficiently-performing employees will seek union office to receive EERA protection, the concern is not unwarranted. "[W]e cannot allow [an employee] genuinely dismissed for valid causes to be reinstated because school authorities were also displeased with [the employee's] exercise of constitutional rights. If it were otherwise [an employee] about to be dismissed for valid causes could insulate [one]self from dismissal simply by engaging in political activities offensive to …

24.

superiors." (*Thornbrough v. Western Placer Unified School Dist.* (2013) 223 Cal.App.4th 169, 197 (*Thornbrough*).)

It remains the Board's responsibility to legitimately evaluate the sincerity and merits of any complaint. Nothing in this opinion changes the Board's longstanding framework to analyze union-retaliation claims.

### d. Summary

In sum, section 3543 protects serving as a union officer. A public employer may not retaliate against a public employee for serving as an officer in a union.[31] The Board's decision to overrule precedent suggesting otherwise is well-taken. (*Boling v. Public Employment Relations Board* (2018) 5 Cal.5th 898, 911 [" 'The proper interpretation of a statute is ultimately the court's responsibility.' "].)

In *Santa Clara,* the Board recently reiterated that "whatever the specifics of their protected activity, employees must separately show that the employer knew of that activity, and that there is at least a *reasonable inference*, based on the evidence, that some adverse action was taken *because of the employee's protected conduct*." (*Santa Clara, supra,* PERB Dec. No. 2349-M at p. 28, emphasis added.) Analysis will always depend on the specific facts in each case—protecting union officers does not change the calculus.

## III. An Inference of Retaliation

Establishing retaliation under the EERA requires either direct proof or evidence "that: (1) the employee exercised rights guaranteed by [the] EERA; (2) the employer had knowledge of the employee's exercise of those rights; (3) the employer took action against or adverse to the interest of the employee; and (4) the employer acted because of the employee's exercise of the guaranteed rights." (*Palo Verde Unified School Dist.* (2013) PERB Dec. No. 2337-E, p. 10 [38 PERC ¶ 69].) We have already determined

---

[31] Although this case involves only the EERA, the same analysis would apply to other PERB-administered statutes utilizing language parallel to section 3543.

Ramirez exercised protected rights, and VUSD does not dispute knowledge and adverse action. The only question is VUSD's intent.

In analyzing an employer's intent, the Board "considers all relevant facts and circumstances …." (*City & County of San Francisco* (2020) PERB Dec. No. 2712-M, p. 21 [44 PERC ¶ 173] (*San Francisco*).) More specifically,[32] it has "identified the following factors as being the most common means of establishing a discriminatory motive, intent, or purpose: (1) timing of the employer's adverse action in relation to the employee's protected conduct; (2) disparate treatment; (3) departure from established procedures or standards; (4) an inadequate investigation; (5) a punishment that is disproportionate based on the relevant circumstances; (6) failure to offer a contemporaneous justification, or offering exaggerated, questionable, inconsistent, contradictory, vague, or ambiguous reasons; (7) employer animosity towards union activists; and (8) any other facts that might demonstrate the employer's unlawful motive." (*Ibid.*)

This analysis, which the Board calls "nexus," is factually intensive. (*San Francisco, supra,* PERB Dec. No. 2712-M, p. 17.) By statute, "[t]he findings of the [B]oard with respect to questions of fact, including ultimate facts, if supported by substantial evidence on the record considered as a whole, are conclusive." (§ 3542, subd. (c).)

On review, " ' "we do not reweigh the evidence. If there is a plausible basis for the Board's factual decisions, we are not concerned that contrary findings may seem to us equally reasonable, or even more so." ' " (*California Teachers Assn. v. Public Employment Relations Bd.* (2009) 169 Cal.App.4th 1076, 1087.) Here, we generally accept the Board's factual findings, subject to the following observations.

_____

[32] Although this case involves only the EERA, the same analysis would apply to other PERB-administered statutes utilizing language parallel to section 3543.

26.

### A. Timing

The Board concluded Ramirez's critical comments in January 2018, just two weeks before she was placed on leave pending an investigation, supported "temporal proximity."[33] VUSD argues the Board erred in considering this sequence, suggesting instead the relevant event is termination in April 2019.

The Board's view is reasonable and entitled to deference. Moreover, the Board found it was "more likely than not" VUSD "decided to investigate Ramirez" after her critical, public comments. Notably, there is significant evidence suggesting VUSD received the parent-complaint underpinning the attendance investigation *prior* to Ramirez criticizing the superintendent, VUSD *also* explicitly documented receiving that complaint "in 'late January 2018.' " We accept the Board's factual resolution because, by relying on VUSD's own documentation, it is eminently reasonable and supported by substantial evidence.[34]

### B. Disparate Treatment

The Board found VUSD "treated Ramirez disparately." Its finding was based on three points.

First, VUSD "had not terminated any other employee for unintentionally misreporting attendance." Second, VUSD "had never performed an audit looking at

---

[33] We note the Board partially concluded temporal proximity was established because Ramirez was a union officer at the time she was placed on leave and terminated. The Board's conclusion failed to identify the correct endpoints, i.e., the time Ramirez became an officer and the time she suffered an adverse action. Because the Board did not analyze the appropriate endpoints, substantial evidence does not support its conclusion Ramirez's status in the union *itself* established temporal proximity.

[34] The "late January 2018" language appears in VUSD's proposed decision following the Education Code hearing. Specifically, the proposal stated "[i]n late January 2018, [VCIS] received a complaint from a parent that her student received a contract violation for missing assignments, even though the student had turned in all assignments." The VUSD school board later voted to terminate Ramirez based on the proposed decision, formally "adopt[ing]" it "in its entirety …."

27.

every data entry … to determine whether an attendance clerk had made incorrect entries."
Third, VUSD's "policy" "anticipated a certain amount of human error," particularly
requiring teachers "to [only] have an 85 percent accuracy rate" with their files.**35**

These points are not supported by substantial evidence. There is no evidence any
employee, other than Ramirez, ever misreported attendance. For the same reason, VUSD
had no occasion to conduct a full-scale audit prior to Ramirez's errors. (*Rio School Dist.*
(2008) PERB Dec. No. 1986-E, p. 17 [33 PERC ¶ 8] [no disparate treatment if no
similarly situated employees].) To the extent VUSD anticipated human error, the
Board's logic ignores the fact VUSD's policies were designed to catch all errors *before*
Ramirez would formally record attendance. VUSD desired to eliminate human error by
the time data reached Ramirez—the policy clearly did not intend human error to persist.**36**

Absent evidence a similarly situated employee committed similar errors, the
disparate treatment finding cannot stand. (*Sacramento City Unified School District* (2010)
PERB Dec. No. 2129-E, p. 10 [34 PERC ¶ 134]; cf. *Gupta v. Trustees of Cal. State Univ.* (2019)
40 Cal.App.5th 510, 519–520 [in Fair Employment and Housing Act case, "comparative data
must be directed at showing disparate treatment between employees who are similarly situated to
the plaintiff in all relevant respects."]). The Board erred in eschewing this requirement.

## C. Inadequate Investigation

Because "Ramirez received specific training for … attendance-keeping at the end
of September 2016," the Board concluded VUSD unfairly "accused [her] of making

---

**35** Accuracy relative to teachers' files was never adequately explained in the
record. Regardless, teachers' files are distinct from Ramirez's job duties. The Board
correctly acknowledged VUSD could "insist on a greater degree of accuracy for its
secretaries," and the paramount importance of accurately reporting attendance, as
opposed to a teacher's file, is readily established throughout the record.

**36** CSEA bemoans the fact VUSD "close[ly] monitor[ed] … Ramirez's routine
tasks, … which had never been done before," suggesting "[f]urther evidence of disparate
treatment …." VUSD's monitoring was justified by Ramirez's years-long inattention to
detail and repeated mistakes. It did not demonstrate disparate treatment.

multiple attendance errors in … August and September 2016."  The Board misapprehends the facts.

It is true Ramirez received training after August 2016; her errors in reporting August attendance occurred *after* she received training.  The record is clear attendance is not entered daily, but rather is inputted every "six weeks."  The first time Ramirez entered attendance was in September 2016, *after* receiving training.  It was at *that* time she committed the August errors.

Elsewhere, the Board properly noted VUSD's investigation failed to uncover "exculpatory" evidence in that Ramirez was allowed to "buddy check [attendance] if [it] had not been done already."  In other words, because VUSD blamed Ramirez for inputting attendance not obviously[37] subject to double-checking, it failed to account for the fact she was empowered to conduct the double-check in the first instance.  The Board also fairly noted VUSD's investigation appeared "rushed" because it "conflated" data, discussed in further detail *post* (**III., E.**).

### D.  Disproportionate Punishment

The VUSD school board, pursuant to Education Code section 45113, conclusively found sufficient cause to terminate Ramirez.  As explained above, the Board was bound by that finding because it was not challenged or set aside.  Accordingly, it was not within the Board's purview to find punishment was disproportionate.  Nonetheless, the Board's finding is not supported by substantial evidence.

The Board inferred "improper motive" because VUSD "did not seriously explore any intermediate discipline for Ramirez, instead opting for summary termination over any form of progressive discipline."  The Board's inference discounts all prior discipline because it was imposed "almost entirely … in her previous position …."

---

[37] By obvious we mean double-checked attendance sheets generally would indicate the double-checker's initials.  It is fair to believe Ramirez would not initial the sheets she herself double-checked because doing so would serve little purpose.

The discount is improper. There is no sound reason an employer cannot consider past conduct in fashioning appropriate discipline. (*Thornbrough, supra,* 223 Cal.App.4th at p. 192 ["all relevant facts should be considered in assessing punishment," including "past discipline"].) Perhaps more importantly, whether particular discipline is warranted is necessarily relative to underlying conduct—sometimes termination is justified, other times it is not. Ultimately, more serious misconduct warrants more serious discipline. The Board's disproportionate-punishment conclusion fails to account for the gravity of errors at issue in this case.

The Board also found VUSD's "standard approach to correcting performance deficiencies" "included informal verbal warnings and multiple written warnings." PERB likewise faults VUSD for "mov[ing] immediately to terminat[e] without any prior discipline." CSEA similarly argues VUSD was "required, prior to termination for non-egregious conduct, … [to] afford[] the intermediate discipline of suspension …."

We disagree this case does not involve progressive discipline. More importantly, PERB and CSEA fail to persuasively explain why, after numerous issues spanning several years, VUSD needed to continue to apply discipline short of termination.[38] (*Thornbrough, supra,* 223 Cal.App.4th at p. 193 ["Once a valid ground of misconduct is shown, an agency has great latitude to determine the appropriate penalty."].) Were PERB and CSEA correct, employees could commit the same mistake ad infinitum without repercussion.

Last, the Board believed VUSD improperly cited, as justification, "evidence it was not permitted to … based on the parties' previous [settlement] agreement[.]" We again disagree. To the extent the prior settlement constituted evidence, it was properly

---

[38] VUSD argues its policies do not mandate progressive discipline. Even if true, progressive discipline is a relevant factor to consider.

admitted by the Education Code hearing officer and subsequently admitted before the Board.[39]

### E. Contemporaneous and Exaggerated Justification[40]

The Board concluded VUSD "exaggerated the financial impact of Ramirez's mistakes." Particularly, the Board noted VUSD "conflated the total number of errors with the total number of students affected, resulting in a purportedly much larger group of students affected …."

VUSD did err by incorrectly believing every error related to a unique student. Similarly, the Board noted VUSD miscalculated financial impact by considering "*annual*" rather than "*daily*" funding per student. The record is clear, however, VUSD believed its liability per student was in fact the annual amount *even if it misreported only*

---

[39] PERB and CSEA agree VUSD "did not abide by the negotiated" settlement by using it as evidence in this matter. This, they suggest, "support[s] [a] retaliatory motive" because it demonstrates deviation from "established" practice. The Education Code hearing officer, however, properly allowed the evidence because the agreement itself permitted the officer's review.

[40] The administrative law judge concluded there was no contemporaneous explanation provided to Ramirez, "suggest[ing] the true reason for the adverse action [was Ramirez's] protected activity and the justification was created post hoc." In our view, not proffering a contemporaneous reason *to the employee* is not always equivalent to post hoc rationalization. Nonetheless, we accept the conclusion. (See *City of San Ramon* (2018) PERB Dec. No. 2571-M, p. 5 [43 PERC ¶ 6] [Board "need not further analyze" issues resolved "adequately" by administrative law judge].)

*a single day*.**41**  Nothing in the record, or cited by the parties, definitively refutes VUSD's belief the annual figure was the correct yardstick.**42**

The Board also found VUSD exaggerated because it "was able to correct" Ramirez's mistakes.  In our view, such a finding unjustly punishes VUSD for identifying errors and ameliorating potential harm.  "When an employee's misconduct creates potential harm to the public, the employer need not wait until actual harm occurs before disciplining the employee."  (*Social Services, supra,* PERB Dec. No. 2624-S at p. 8, citing *County of Siskiyou v. State Personnel Bd.* (2010) 188 Cal.App.4th 1606, 1615 [" '[I]n the context of public employee discipline,' the 'overriding consideration' is 'the extent to which the employee's conduct resulted in, or if repeated is likely to result in, "harm to the public service." ' "].)

Significantly, the Board determined VUSD's falsification allegation was exaggerated.  Falsification, the Board stated, involved intentional conduct, and the

---

**41** A witness testified VUSD's potential liability, i.e., penalty, equaled $9,350 per student.  It is unclear whether the testimony meant per erroneously reported attendance or per student.  For example, if one student's attendance was erroneously reported 50 times, was the school subject to 50 penalties, or one?  Ultimately, we need not resolve the question because we can simply defer to the Board's overall exaggeration finding. Indeed, the record appears insufficient for this court to definitively ascertain potential financial impact.

**42** The Board, and the administrative law judge, criticized the superintendent for believing "liability per error was either $9,089 or $9,350 …."  The criticism is based on the superintendent testifying her belief "was based on information" from the chief business officer who, in turn, testified "he did not know the fiscal impact of the errors …."  PERB blames VUSD for "consult[ing] a single source … about the fiscal impact of Ramirez's errors."

The chief business officer, however, clearly testified he provided the annual figures, i.e., $9,350, and the superintendent's final report summarized "the potential impact … of [Ramirez's] errors[.]"  He testified to the same at the Education Code hearing, making clear he "provided the actual dollar figure potential impact based on these errors …."  Similarly, the compliance coordinator testified the school could potentially lose annual funding for a single error.  The Board's focus on an annual funding amount is misplaced.

superintendent's testimony falsification included "inaccuracies" was less than credible.**43** These findings are supported by substantial evidence.

Finally, the Board believed VUSD's "insubordination allegation was exaggerated" because insubordination "requires … willful conduct." Although we might disagree there is no willful conduct in this case, we again accept the Board's resolution.**44**

### F. Union Animosity

The Board concluded VUSD exhibited "union animus." Its conclusion was based on VCIS's principal explicitly commenting Ramirez's work might suffer if she served in the union, coupled with the leave-notice's prohibitions on entering VUSD property and conversing with union members. To the extent the animus finding, particularly the leave letter's failure to accommodate union activity, involves factual resolution, we accept and defer to the Board's determination. (*Fallbrook Union Elementary School Dist.* (2011) PERB Dec. No. 2171-E, p. 10 [35 PERC ¶ 58] [employer's expression " '[u]nion duties have gotten in the way of … teaching objectives' " "may support a finding of union animus *when coupled with other facts*"], emphasis added.)

---

**43** The falsification-charge language mirrors a VUSD administrative regulation defining "causes" for "suspension, demotion, involuntary reassignment, [and] dismissal …." Nonetheless, we defer to the Board, especially because the superintendent, at the Education Code hearing, testified the mistakes were "falsification on purpose …."

**44** VCIS directed Ramirez to implement numerous procedures to improve her work, but she did not implement every directive. For example, she acknowledged not implementing a directive "to have others check [her] work for accuracy," explaining "no one" was available to "check [her] work." (See *San Diego Unified School Dist.* (1991) PERB Dec. No. 885-E, pp. 81-82 [15 PERC ¶ 22103] [insubordination includes refusing to implement directives].) This directive was contained in the withdrawn July 22, 2015, reprimand, but was properly considered by the Education Code hearing officer. As previously noted, that hearing's transcript, along with attendant exhibits, was admitted before the Board.

## G. Conclusion

Overall, we accept the Board's conclusion VUSD inferentially terminated Ramirez in retaliation for protected activity. Its conclusion is reasonable due to the timing between Ramirez's critical comments at the VUSD school board meeting and her subsequent placement on leave, VUSD's exaggerated and noncontemporary justifications, VUSD's inadequate investigation, and VUSD's union animosity. The disparate treatment and disproportionate factors, however, do not withstand scrutiny and are not supported by substantial evidence. We turn next to evaluate VUSD's affirmative defense.

## IV. VUSD Proved Its Affirmative Defense

Relying on "documented concerns with Ramirez's performance since 2013," VUSD argues "substantial evidence supports that [she] would have been terminated absent her protected activit[ies] …." PERB contends "[t]he Board correctly rejected" VUSD's performance-related justification because the "data entry errors … did not 'damag[e]' " VUSD, " 'potential fiscal impact' " was insubstantial, any resulting "minimal harm" did not "merit termination," and prior performance concerns did not previously "warrant termination." CSEA claims the Board "appropriately rejected the … argument … minor performance issues were the basis for … termination." We believe VUSD's argument is well-taken.

"The charging party has the burden of showing protected conduct was a motivating factor in the employer's decision. Once that is established, then the burden shifts to the employer to establish an affirmative defense. Typically, the employer must show that despite the anti-union motivation, the employment decision would have been taken anyway, for other, legitimate business reasons." (*Trustees of California State University v. Public Employment Relations Bd.* (1992) 6 Cal.App.4th 1107, 1129.)

"[T]he test of employer conduct in a mixed motive situation, where legitimate business reasons arguably concur with anti-union motivations as the basis for an

34.

employment decision, is a 'but for' test—whether the discharge or other violation of protected activity would have occurred anyway regardless of the improper anti-union motivation. This is an affirmative defense which the employer must establish by a preponderance of the evidence …." (*McPherson v. Public Employment Relations Bd.* (1987) 189 Cal.App.3d 293, 304; *Cabrillo Community College Dist.* (2015) PERB Dec. No. 2453-E, p. 12 [40 PERC ¶ 57]; *San Joaquin, supra,* 82 Cal.App.5th at pp. 1069-1070; *Thornbrough, supra,* 223 Cal.App.4th at p. 195; cf. *Mt. Healthy City School District Board of Ed. v. Doyle* (1977) 429 U.S. 274, 287 [preponderance standard to assess employer's defense]; *Martori Brothers Distributors v. Agricultural Labor Relations Bd.* (1981) 29 Cal.3d 721, 730 ["once the employee has shown that his union activities were a motivating factor in the employer's decision to discharge him, the burden shifts to the employer to show that discharge would have occurred in any event."].)

" 'In the case where the trier of fact has expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party' " seeks review, the reviewing court does not ask " 'whether substantial evidence supports the judgment.' " (*Valero v. Board of Retirement of Tulare County Employees' Assn.* (2012) 205 Cal.App.4th 960, 965.) Rather, " 'where the issue on [review] turns on a failure of proof …, the question for [the] reviewing court becomes whether the evidence compels a [contrary] finding … as a matter of law.' " (*Id.* at p. 966; *Phipps v. Copeland Corporation LLC* (2021) 64 Cal.App.5th 319, 333.)

The record in this matter compels a finding in VUSD's favor; the Board's conclusion VUSD failed to carry its burden is unreasonable. To begin, it is important to understand the relevant adverse action is the VUSD school board's vote to terminate— not Ramirez's placement on leave. (*Thornbrough, supra,* 223 Cal.App.4th at pp. 198-199.)

There is no doubt, absent Ramirez's protected activities, VUSD would have uncovered her numerous errors. Accepting as accurate the Board's timeline, i.e., VUSD decided to investigate Ramirez after she criticized the superintendent and *then* received a complaint about inaccurate attendance, it is clear the ultimate decision to terminate is based on serious errors striking at the school's primary administrative functions.

Ramirez's errors, and their discovery, were entirely divorced from any union activity. Those errors were real, not fancied or imagined. The attendant investigation originated not in union activity but in a parent's legitimate complaint.

On this point, CSEA argues "falsification … was the impetus for the investigation and proposed discipline, and without it, it is unlikely [VUSD] would have even sought discipline since the remaining infractions were old and had not been considered serious enough to warrant discipline." That misreads the record.

The Education Code hearing officer did not sustain VUSD's falsification charge. The VUSD school board fully accepted the officer's findings, including the fact falsification was not substantiated. The school board voted to terminate Ramirez *anyway*, precisely because she repeated errors and mistakes over many years. It is without question the school board's decision to terminate rested on the repeated nature of similar transgressions and not on a belief Ramirez intentionally falsified records.

Contrary to PERB's and CSEA's suggestions, those transgressions were neither "minimal" nor "minor …." CSEA asserts the "end result was that there was no impact on any … student from Ramirez's alleged errors." We are not convinced a result-oriented metric is appropriate.[45]

" 'In considering whether … abuse occurred in the context of public employee discipline, … the overriding consideration in these cases is the extent to which the

---

[45] We disagree no students were affected by Ramirez's errors, but are willing to accept CSEA's assertion on review. Certainly, the student whose parent complained was affected, even if any harm was ameliorated.

36.

employee's conduct resulted in, or if repeated is likely to result in, "[harm] to the public service." ' [Citations.] 'Other relevant factors include the circumstances surrounding the misconduct and the likelihood of its recurrence.' " (*Pasos v. Los Angeles County Civil Service Commission* (2020) 52 Cal.App.5th 690, 701 (*Pasos*).)

Here, VUSD was legitimately concerned the state would close VCIS due to misreporting attendance. That is a disastrous consequence. Employers need not await disaster to abate catastrophe. (*Social Services, supra,* PERB Dec. No. 2624-S at. p. 8.) Potential liability and likely recurrence are sufficient to act.

Beyond attendance, the Board *never* confronted Ramirez's errors relating to transcripts and grades.[46] Although not fully described in the record,[47] these errors also are neither "minimal" nor "minor …." Errors on permanent academic records are potentially catastrophic to a person's life, especially teenagers at a high school.

For better or worse, VCIS needs money to operate, and students need grades and transcripts to pursue education. Ramirez's errors struck directly at the school's most basic, essential infrastructure. PERB's suggestion Ramirez did not " 'damag[e]' the core function of" VUSD is direly misplaced—the facts errors were corrected and harm did not materialize are not exculpatory. On this record, VUSD was not obligated to continue to employ a person repeatedly committing serious errors. (See *Social Services, supra,* PERB Dec. No. 2624-S at p. 8; *Pasos, supra,* 52 Cal.App.5th at 701.)

In *Jurupa Unified School Dist.,* the Board found an employee's termination justified by a "long record of complaints …, many of which predated the [alleged]

---

[46] As noted, the Board also failed to address VUSD's claim preclusion, collateral estoppel, mandamus, and arbitration arguments. (See *ante,* **I.**)

[47] The record indicates Ramirez failed to timely enter "fall grades" by January 2018, "grades had been entered wrong," and "there [were] wrong dates for transferring, dropping[, and graduating] students …." "[O]ther staff members had to go in and make the corrections." Ramirez partially acknowledged discussing transcripts with the principal.

protected activity …." (*Jurupa Unified School Dist.* (2015) PERB Dec. No. 2450-E, pp. 11-12 [40 PERC ¶ 46].)  It concluded the district there "amply met its … burden" by "showing" it terminated the employee "because of … repeated misconduct."  (*Id.* at p. 21.)  The evidence in this case supports the same result.

The Board's conclusion here—that Ramirez's deficient performance merited discipline *less than* termination—is without reasonable basis.  Wrongful termination jurisprudence necessitates "the need for a sensible latitude for managerial decisionmaking …."  (*Cotran v. Rollins Hudig Hall Intern., Inc.* (1998) 17 Cal.4th 93, 106.)  " 'Employers are sometimes forced to remove employees who are performing poorly, engaging in improper work conduct, or severely disrupting the workplace ….  Precedent does not prevent [an employer] from removing such an employee simply because the employee [recently] engaged in … protected … activity ….' "  (*Arteaga v. Brink's, Inc.* (2008) 163 Cal.App.4th 327, 354.)  "What constitutes satisfactory performance is of course a question ordinarily vested in the employer's sole discretion." (*Cheal v. El Camino Hospital* (2014) 223 Cal.App.4th 736, 742; cf. *Pugh v. See's Candies, Inc.* (1981) 116 Cal.App.3d 311, 330 ["Care must be taken … not to interfere with the legitimate exercise of managerial discretion."].)

The errors in this case, corrected or otherwise, were egregious, numerous, and occurred over several years.  (See *Thornbrough, supra,* 223 Cal.App.4th at p. 192 ["all relevant facts should be considered in assessing punishment," including "past discipline"].)  There was no reason to believe the errors would subside.[48]

Indeed, the reprimand letters, substandard performance reviews, and errors underlying Ramirez's termination all point to her failure to grasp and perform duties correctly, inattention to detail, not following direction, causing disruption and generating additional work, not understanding the impact her errors wrought, and not achieving

---

[48] At least one witness testified "concerns" with Ramirez's work did not improve.

VUSD's expected performance. These concerns were stressed repeatedly over time without any reason to believe they were alleviated.

Importantly, VUSD previously sought termination for similar issues predating any alleged union activity, adequately dispelling a retaliatory inference. That proceeding was settled. This time, the VUSD school board, well aware of Ramirez's union activities, voted to terminate Ramirez due to her longstanding, inadequate performance. Again, the Education Code hearing's cause-sufficient-to-terminate finding is "conclusive." (Ed. Code, § 45113, subd. (b).)

Viewed fully, with appreciation for the serious errors at issue, the only reasonable conclusion is VUSD justifiably terminated Ramirez. Accordingly, the record compels a finding VUSD affirmatively proved it would have terminated Ramirez notwithstanding her protected union activity.[49]

## V. Summary

An employee's service as a union officer is activity protected by the EERA under section 3543.5. VUSD's contrary arguments—including exhaustion and forfeiture—are not persuasive. The Board, however, erred in finding VUSD failed to prove its affirmative defense.

## DISPOSITION

The petition is granted and Public Employment Relations Board published decision number 2806-E [46 PERC ¶ 115] is set aside. The Board is directed to modify

---

[49] Our analysis applies equally to the derivative interference claim.

the decision consistent with this opinion and dismiss the complaint issued against VUSD. (§ 3542, subd. (c).)  Costs are awarded to VUSD.  (Cal. Rules of Court, rule 8.493.)

SNAUFFER, J.

WE CONCUR:


POOCHIGIAN, Acting P. J.


DETJEN, J.